1  Ben F. Pierce Gore (SBN 128515)
2  PRATT & ASSOCIATES
   1901 S. Bascom Avenue, Suite 350
3  Campbell, CA  95008
   Telephone:  (408) 429-6506
4  Fax:  (408) 369-0752
   pgore@prattattorneys.com
5
   *Attorneys for Plaintiff*
6

ADR

E-FILING

FILED

MAY 23 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

HRL

7

8

9         IN THE UNITED STATES DISTRICT COURT

10       FOR THE NORTHERN DISTRICT OF CALIFORNIA

11              SAN JOSE DIVISION

12

CV12-02646

13  NANCY LANOVAZ, individually and on          Case No.
    behalf of all others similarly situated,
14                                              **CLASS ACTION AND REPRESENTATIVE**
                Plaintiff,                      **ACTION**
15
    v.                                          **COMPLAINT FOR DAMAGES,**
16                                              **EQUITABLE AND INJUNCTIVE RELIEF**
    TWININGS NORTH AMERICA, INC.,
17                                              **JURY TRIAL DEMANDED**
                Defendant.
18

19

20         Plaintiff, through the undersigned attorneys, brings this lawsuit against Defendant as to

21  Plaintiff's own acts upon personal knowledge, and as to all other matters upon information and

22  belief.  In order to remedy the harm arising from Defendant's illegal conduct, which has resulted

23  in unjust profits, Plaintiff brings this action on behalf of a class of California consumers who,

24  within the last four years, purchased Defendant's tea products ("Misbranded Food Products").

25                                  **INTRODUCTION**

26         1.     Every day, millions of Americans purchase and consume packaged foods.

27  Identical federal and California laws require truthful, accurate information on the labels of

28  packaged foods.  This case is about a company that flouts those laws even after companies with

                              *Class Action Complaint*

identical products with similar claims on their labels received warning letters from the FDA notifying those companies that their products were misbranded. The law is clear: misbranded food cannot legally be manufactured, held, advertised, distributed or sold. Misbranded food is worthless as a matter of law, and purchasers of misbranded food are entitled to a refund of their purchase price.

2.      Twinings North America, Inc. (hereinafter "Twinings" or "Defendant") is a tea company based in Clifton, New Jersey. Twinings is a wholly owned subsidiary of Associated British Foods. It markets over 50 varieties of tea, including black, green and herbal teas.

3.      Twinings actively promotes the presence of antioxidants in its tea products and the alleged health benefits from using these products. On its website Twinings states:

> You might not have heard of them, but flavonoid antioxidants are naturally present in lots of food, including fruit, vegetables and tea. Along with other antioxidants like vitamin C, vitamin A and chlorophyll, flavonoid antioxidants can help to keep cells and tissues healthy.
> They do this by mopping up free radicals—atoms or molecules with unpaired electrons. Free radicals are made by all living organisms, but they're also in things like pollution. While we all need free radicals, a build-up in our bodies can damage cells and DNA.
>
> …. Green tea is naturally rich in antioxidants that may help protect the body from damage caused by free radicals.
>
> Red "teas", or Rooibos, are herbal infusions made from the leaves of an African red bush. Red tea is naturally caffeine-free and high in antioxidants….
>
> A naturally caffeine-free herbal tea expertly blended with authentic Rooibos or herbal red tea which has a distinctive reddish colour and pleasantly sweet flavour that naturally contains antioxidants.
> This Herbal Red Tea comes only from the Cedarberg Mountains in the remote area of central South Africa and naturally contains antioxidants and has a pleasantly sweet taste….
> ….
> Did you know: Tea is a healthy beverage. Rich in antioxidants, refreshing and less than 1 calorie per serving if you don't add sugar or milk

http://www.twiningsusa.com/template.php?id=22

4.      In doing so, Twinings uses its website to make unlawful (i) antioxidant, (ii) nutrient content, and (iii) health claims that have been expressly condemned by the Federal Food and Drug Administration ("FDA") in numerous enforcement actions and warning letters.

5.      Twinings also makes unlawful nutrient content claims directly on packages of the Misbranded Food Products.  For example, the package front panel of Twinings' Green Tea Jasmine, shown below, bears the statement *"Natural Source of Antioxidants."* Improper antioxidant claims like the ones made by Twinings have been repeatedly targeted by the FDA as unlawful for tea and other food products.

FRONT OF PACKAGE



6.      Twinings recognizes that health claims drive sales. In a press release on Twinings' 300th anniversary it stated:

**Q:** Where does Twinings sit among competitor tea brands internationally?

**A:** Twinings has 4.2% share of the global tea market. Twinings is the 2nd largest tea brand.

**Q:** Where is the tea market heading? What are your predictions?

**A:** The tea market is forecast to grow in the future, with all sectors in growth except instant tea. The strongest growth is forecast in the premium sectors of black speciality tea (+2.6%), green tea (+2.6%) and infusions (+3.6%).**The main drivers in forecast growth are the increasing number of health conscious consumers,** wider product choice, improved manufacture, distribution and retail networks and increased advertising expenditure and lifestyle choice.

http://www.twinings.com/int/media/300_yr_anniversary_media_qandas.pdf

7.     The Misbranded Food Products each contain an unlawful antioxidant, nutrient content and/or health claim on their label.

8.     If a manufacturer is going to make a claim on a food label, the label must meet certain legal requirements that help consumers make informed choices and ensure that they are not misled.  As described more fully below, Defendant has made, and continues to make, false and deceptive claims in violation of federal and California laws that govern the types of representations that can be made on food labels.  These laws recognize that reasonable consumers are likely to choose products claiming to have a health or nutritional benefit over otherwise similar food products that do not claim such benefits.

9.     Identical federal and California laws regulate the content of labels on packaged food.  The requirements of the federal Food Drug & Cosmetic Act, 21 U.S.C. § 301, *et seq.* ("FDCA") were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law, California Health & Safety Code § 109875, *et seq.* (the "Sherman Law").  Under FDCA section 403(a), food is "misbranded" if "its labeling is false or misleading in any particular," or if it does not contain certain information on its label or in its labeling.  21 U.S.C. § 343(a).

10.     Under the FDCA, the term "false" has its usual meaning of "untruthful," while the term "misleading" is a term of art.  Misbranding reaches not only false claims, but also those claims that might be technically true, but still misleading.  If any one representation in the labeling is misleading, then the entire food is misbranded, and no other statement in the labeling can cure a misleading statement.  "Misleading" is judged in reference to "the ignorant, the unthinking and the credulous who, when making a purchase, do not stop to analyze."  *United States v. El-O-Pathic Pharmacy*, 192 F.2d 62, 75 (9th Cir. 1951).  Under the FDCA, it is not

necessary to prove that anyone was actually misled.

11.    On August 23, 2010, the FDA sent a warning letter to Unilever, the parent company of Lipton Tea, one of Twinings' biggest competitors, informing Unilever of Lipton Tea's failure to comply with the FDCA and its regulations (the "FDA Warning Letter," is attached hereto as Exhibit 1 and made a part hereof by reference) for remarkably similar nutrient content claims to those Twinings is presently making on its product labels. The FDA Warning Letter to Unilever stated, in pertinent part:

**Unauthorized Nutrient Content Claims**

Under section 403(r)(1)(A) of the Act [21 U.S.C. 343(r)(1)(A)], a claim that characterizes the level of a nutrient which is of the type required to be in the labeling of the food must be made in accordance with a regulation promulgated by the Secretary (and, by delegation, FDA) authorizing the use of such a claim. The use of a term, not defined by regulation, in food labeling to characterize the level of a nutrient misbrands a product under section 403(r)(1)(A) of the Act.

Nutrient content claims using the term "antioxidant" must also comply with the requirements listed in 21 CFR 101.54(g). These requirements state, in part, that for a product to bear such a claim, an RDI must have been established for each of the nutrients that are the subject of the claim (21 CFR 101.54(g)(1)), and these nutrients must have recognized antioxidant activity (21 CFR 101.54(g)(2). The level of each nutrient that is the subject of the claim must also be sufficient to qualify for the claim under 21 CFR 101.54(b), (c), or (e) (21 CFR 101.54(g)(3)). For example, to bear the claim "high in antioxidant vitamin C," the product must contain 20 percent or more of the RDI for vitamin C under 21 CFR 101.54(b). Such a claim must also include the names of the nutrients that are the subject of the claim as part of the claim or, alternatively, the term "antioxidant" or "antioxidants" may be linked by a symbol (e.g., an asterisk) that refers to the same symbol that appears elsewhere on the same panel of the product label, followed by the name or names of the nutrients with recognized antioxidant activity (21 CFR 101.54(g)(4)). The use of a nutrient content claim that uses the term "antioxidant" but does not comply with the requirements of 21 CFR 101.54(g) misbrands a product under section 403(r)(2)(A)(i) of the Act.

Your webpage entitled "Tea and Health" and subtitled "Tea Antioxidants" includes the statement, "LIPTON Tea is made from tea leaves rich in naturally protective antioxidants." The term "rich in" is defined in 21 CFR 101.54(b) and may be used to characterize the level of antioxidant nutrients (21 CFR 101.54(g)(3)). However, this claim does not comply with 21 CFR 101.54(g)(4) because it does not include the nutrients that are the subject of the claim or use a symbol to link the term "antioxidant" to those nutrients. Thus, this claim misbrands your product under section 403(r)(2)(A)(i) of the Act.

This webpage also states: "[t]ea is a naturally rich source of antioxidants." The term "rich source" characterizes the level of antioxidant nutrients in the product and, therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "rich source" could be considered a synonym for a term defined by regulation (e.g., "high" or "good source"), nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). The claim "tea is a naturally rich source of antioxidants" does not include the nutrients that are the subject of the claim or use a symbol to link the term "antioxidant" to those nutrients, as required by 21 CFR 101.54(g)(4).  Thus, this claim misbrands your product under section 403(r)(2)(A)(i) of the Act.

The product label back panel includes the statement "packed with protective FLAVONOID ANTIOXIDANTS." The term "packed with" characterizes the level of flavonoid antioxidants in the product; therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "packed with" could be considered a synonym for a term defined by regulation, nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). The claim "packed with FLAVONOID ANTIOXIDANTS" does not comply with 21 CFR 101.54(g)1 because no RDI has been established for flavonoids. Thus, this unauthorized nutrient content claim causes your product to be misbranded under section 403(r)(2)(A)(i) of the Act.

The above violations are not meant to be an all-inclusive list of deficiencies in your products or their labeling. It is your responsibility to ensure that all of your products are in compliance with the laws and regulations enforced by FDA. You should take prompt action to correct the violations. Failure to promptly correct these violations may result in regulatory actions without further notice, such as seizure and/or injunction.

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm224509.htm.

12.     As shown above, the front panel on Twinings' tea products contains the statement "*Natural source of Antioxidants*" while its website claims that tea is" *naturally rich in antioxidants*" or "*contains antioxidants.*" Such antioxidant claims are unlawful, and therefore the products are misbranded.

13.     Defendant has made, and continues to make, food label claims that are prohibited by federal and California law.  Under federal and California law, Defendant's Misbranded Food Products cannot legally be manufactured, advertised, distributed, held or sold.  Defendant's false

and misleading labeling practices stem from their global marketing strategy.  The violations and misrepresentations are similar across Defendant's product labels and product lines.

## PARTIES

14.     Plaintiff Nancy Lanovaz is a resident of Los Gatos, California who purchased Twinings Tea products in California during the four (4) years prior to the filing of this Complaint (the "Class Period").

15.     Defendant, Twinings of North America, Inc. is a Delaware corporation with its principle place of business in Clifton, New Jersey.

16.     Twinings is a leading producer of retail tea products, including black, green and specialty tea products. Twinings sells its Misbranded Food Products to consumers through grocery stores, other retail stores and on its website throughout California.

## JURISDICTION AND VENUE

17.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which:  (1) there are over 100 members in the proposed class; (2) members of the proposed class have a different citizenship from Defendant; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate.

18.     The Court has jurisdiction over the federal claim alleged herein pursuant to 28 U.S.C. § 1331, because it arises under the laws of the United States.

19.     The Court has jurisdiction over the California claims alleged herein pursuant to 28 U.S.C. § 1367, because they form part of the same case or controversy under Article III of the United States Constitution.

20.     Alternatively, the Court has jurisdiction over all claims alleged herein pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, and is between citizens of different states.

21.     The Court has personal jurisdiction over Defendant because a substantial portion of the wrongdoing alleged in this Complaint occurred in California, Defendant is authorized to do business in California, has sufficient minimum contacts with California, and otherwise intentionally avails itself of the markets in California through the promotion, marketing and sale

1   of merchandise, sufficient to render the exercise of jurisdiction by this Court permissible under

2   traditional notions of fair play and substantial justice.

3        22.    Because a substantial part of the events or omissions giving rise to these claims

4   occurred in this District and because the Court has personal jurisdiction over Defendant, venue is

5   proper in this Court pursuant to 28 U.S.C. § 1391(a) and (b).

6                              **FACTUAL ALLEGATIONS**

7   **A.    Identical California And Federal Laws Regulate Food Labeling**

8        23.    Food manufacturers are required to comply with federal and state laws and

9   regulations that govern the labeling of food products.  First and foremost among these is the

10  FDCA and its labeling regulations, including those set forth in 21 C.F.R. § 101.

11       24.    Pursuant to the Sherman Law, California has expressly adopted the federal

12  labeling requirements as its own and indicated that "[a]ll food labeling regulations and any

13  amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993,

14  or adopted on or after that date shall be the food regulations of this state."  California Health &

15  Safety Code § 110100.

16       25.    In addition to its blanket adoption of federal labeling requirements, California has

17  also enacted a number of laws and regulations that adopt and incorporate specific enumerated

18  federal food laws and regulations.  For example, food products are misbranded under California

19  Health & Safety Code § 110660 if their labeling is false and misleading in one or more

20  particulars; are misbranded under California Health & Safety Code § 110665 if their labeling fails

21  to conform to the requirements for nutrient labeling set forth in 21 U.S.C. § 343(q) and

22  regulations adopted thereto; are misbranded under California Health & Safety Code § 110670 if

23  their labeling fails to conform with the requirements for nutrient content and health claims set

24  forth in 21 U.S.C. § 343(r) and regulations adopted thereto; are misbranded under California

25  Health & Safety Code § 110705 if words, statements and other information required by the

26  Sherman Law to appear on their labeling are either missing or not sufficiently conspicuous; are

27  misbranded under California Health & Safety Code § 110735 if they are represented as having

28  special dietary uses but fail to bear labeling that adequately informs consumers of their value for

that use; and are misbranded under California Health & Safety Code § 110740 if they contain artificial flavoring, artificial coloring and chemical preservatives but fail to adequately disclose that fact on their labeling.

**B.     FDA Enforcement History**

26.     In recent years the FDA has become increasingly concerned that food manufacturers were disregarding food labeling regulations. To address this concern, the FDA elected to take steps to inform the food industry of its concerns and to place the industry on notice that food labeling compliance was an area of enforcement priority.

27.     In October 2009, the FDA issued a *Guidance For Industry: Letter Regarding Point Of Purchase Food Labeling* to address its concerns about front of package labels ("2009 FOP Guidance"). The 2009 FOP Guidance advised the food industry:

> FDA's research has found that with FOP labeling, people are less likely to check the Nutrition Facts label on the information panel of foods (usually, the back or side of the package). It is thus essential that both the criteria and symbols used in front-of-package and shelf-labeling systems are nutritionally sound, well-designed to help consumers make informed and healthy food choices, and not be false or misleading. The agency is currently analyzing FOP labels that appear to be misleading. The agency is also looking for symbols that either expressly or by implication are nutrient content claims. We are assessing the criteria established by food manufacturers for such symbols and comparing them to our regulatory criteria.

> It is important to note that nutrition-related FOP and shelf labeling, while currently voluntary, is subject to the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations. Therefore, FOP and shelf labeling that is used in a manner that is false or misleading misbrands the products it accompanies. Similarly, a food that bears FOP or shelf labeling with a nutrient content claim that does not comply with the regulatory criteria for the claim as defined in Title 21 Code of Federal Regulations (CFR) 101.13 and Subpart D of Part 101 is misbranded. We will consider enforcement actions against clear violations of these established labeling requirements. . .

> … Accurate food labeling information can assist consumers in making healthy nutritional choices. FDA intends to monitor and evaluate the various FOP labeling systems and their effect on consumers' food choices and perceptions. FDA recommends that manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA laws and regulations. FDA will proceed with enforcement action against products that bear FOP labeling that are explicit or implied nutrient content claims and that are not

consistent with current nutrient content claim requirements. FDA will also proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading.

28.     The 2009 FOP Guidance recommended that "manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA law and regulations" and specifically advised the food industry that it would "proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading."

29.     Despite the issuance of the 2009 FOP Guidance, Defendant did not remove the unlawful and misleading food labeling claims from their Misbranded Food Products.

30.     On March 3, 2010, the FDA issued an "Open Letter to Industry from [FDA Commissioner] Dr. Hamburg" (hereinafter, "Open Letter"). The Open Letter reiterated the FDA's concern regarding false and misleading labeling by food manufacturers. In pertinent part the letter stated:

> In the early 1990s, the Food and Drug Administration (FDA) and the food industry worked together to create a uniform national system of nutrition labeling, which includes the now-iconic Nutrition Facts panel on most food packages.  Our citizens appreciate that effort, and many use this nutrition information to make food choices.  Today, ready access to reliable information about the calorie and nutrient content of food is even more important, given the prevalence of obesity and diet-related diseases in the United States.  This need is highlighted by the announcement recently by the First Lady of a coordinated national campaign to reduce the incidence of obesity among our citizens, particularly our children.
>
> With that in mind, I have made improving the scientific accuracy and usefulness of food labeling one of my priorities as Commissioner of Food and Drugs.  The latest focus in this area, of course, is on information provided on the principal display panel of food packages and commonly referred to as "front-of-pack" labeling. The use of front-of-pack nutrition symbols and other claims has grown tremendously in recent years, and it is clear to me as a working mother that such information can be helpful to busy shoppers who are often pressed for time in making their food selections. ...
>
> As we move forward in those areas, I must note, however, that there is one area in which more progress is needed.  As you will recall, we recently expressed concern, in a "Dear Industry" letter, about the number and variety of label claims that may not help consumers distinguish healthy food choices from less healthy ones and, indeed, may be false or misleading.

At that time, we urged food manufacturers to examine their product labels in the context of the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations. As a result, some manufacturers have revised their labels to bring them into line with the goals of the Nutrition Labeling and Education Act of 1990. Unfortunately, however, we continue to see products marketed with labeling that violates established labeling standards.

To address these concerns, FDA is notifying a number of manufacturers that their labels are in violation of the law and subject to legal proceedings to remove misbranded products from the marketplace. While the warning letters that convey our regulatory intentions do not attempt to cover all products with violative labels, they do cover a range of concerns about how false or misleading labels can undermine the intention of Congress to provide consumers with labeling information that enables consumers to make informed and healthy food choices

. . . .

These examples and others that are cited in our warning letters are not indicative of the labeling practices of the food industry as a whole. In my conversations with industry leaders, I sense a strong desire within the industry for a level playing field and a commitment to producing safe, healthy products. That reinforces my belief that FDA should provide as clear and consistent guidance as possible about food labeling claims and nutrition information in general, and specifically about how the growing use of front-of-pack calorie and nutrient information can best help consumers construct healthy diets.

I will close with the hope that these warning letters will give food manufacturers further clarification about what is expected of them as they review their current labeling. I am confident that our past cooperative efforts on nutrition information and claims in food labeling will continue as we jointly develop a practical, science-based front-of-pack regime that we can all use to help consumers choose healthier foods and healthier diets.

31.   Notwithstanding the Open Letter, Defendant continued to utilize unlawful food labeling claims despite the express guidance of the FDA in the Open Letter.

32.   In addition to its guidance to industry, the FDA has sent warning letters to industry, including many of Defendant's peer/competitor food manufacturers for the same types of unlawful nutrient content claims described above.

33.   In these letters the FDA indicated that, as a result of the same type of claims utilized by Defendant, products were in "violation of the Federal Food, Drug, and Cosmetic Act ... and the applicable regulations in Title 21, Code of Federal Regulations, Part 101 (21 CFR §

1   101)" and "misbranded within the meaning of section 403(r)(1)(A) because the product label

2   bears a nutrient content claim but does not meet the requirements to make the claim."

3         34.    The warning letters were hardly isolated as the FDA has issued over ten (10)

4   warning letters to other companies for the same type of food labeling claims at issue in this case.

5         35.    The FDA not only expected companies that received warning letters to correct

6   their labeling practices but because these letters were made public and released to the press, FDA

7   also anticipated that other firms would examine their food labels to ensure that they are in full

8   compliance with food labeling requirements and make changes where necessary. Defendant did

9   not change the labels on its Misbranded Food Products in response to these warning letters.

10         36.    Defendant also continued to ignore the 2009 FOP Guidance which detailed the

11   FDA's guidance on how to make food labeling claims. Defendant ignored this guidance as well

12   and continued to utilize unlawful claims on the labels of their Misbranded Food Products.  As

13   such, the Defendant's Misbranded Food Products continue to run afoul of 2009 FOP Guidance as

14   well as federal and California law.

15         37.    Despite the FDA's numerous warnings to industry, Defendant has continued to sell

16   products bearing unlawful food labeling claims without meeting the requirements to make them.

17         38.    Plaintiff did not know, and had no reason to know, that the Defendant's

18   Misbranded Food Products were misbranded and bore food labeling claims despite failing to meet

19   the requirements to make those food labeling claims.

20   **C.**    **Defendant's Food Products Are Misbranded**

21         39.    Pursuant to Section 403 of the FDCA, a claim that characterizes the level of a

22   nutrient in a food is a "nutrient content claim" that must be made in accordance with the

23   regulations that authorize the use of such claims. 21 U.S.C. § 343(r)(1)(A).  California expressly

24   adopted the requirements of 21 U.S.C. § 343(r) in § 110670 of the Sherman Law.

25         40.    Nutrient content claims are claims about specific nutrients contained in a product.

26   They are typically made on the front of packaging in a font large enough to be read by the

27   average consumer.  Because these claims are relied upon by consumers when making purchasing

28   decisions, the regulations govern what claims can be made in order to prevent misleading claims.

41.     Section 403(r)(1)(A) of the FDCA governs the use of expressed and implied nutrient content claims on labels of food products that are intended for sale for human consumption. *See* 21 C.F.R. § 101.13.

42.     21 C.F.R. § 101.13 provides the general requirements for nutrient content claims, which California has expressly adopted. *See* California Health & Safety Code § 110100.

43.     An "expressed nutrient content claim" is defined as any direct statement about the level (or range) of a nutrient in the food (*e.g.*, "low sodium" or "contains 100 calories"). *See* 21 C.F.R. § 101.13(b)(1).

44.     An "implied nutrient content claim" is defined as any claim that: (i) describes the food or an ingredient therein in a manner that suggests that a nutrient is absent or present in a certain amount (*e.g.*, "high in oat bran"); or (ii) suggests that the food, because of its nutrient content, may be useful in maintaining healthy dietary practices and is made in association with an explicit claim or statement about a nutrient (*e.g.*, "healthy, contains 3 grams (g) of fat"). 21 C.F.R. § 101.13(b)(2)(i-ii).

### 1.     **Defendant Makes Unlawful Antioxidant Claims**

45.     Federal and California regulations regulate antioxidant claims as a particular type of nutrient content claim. Specifically, 21 C.F.R. § 101.54(g) contains special requirements for nutrient claims that use the term "antioxidant":

(1)     the name of the antioxidant must be disclosed;

(2)     there must be an established Recommended Daily Intake ("RDI") for that antioxidant, and if not, no "antioxidant" claim can be made about it;

(3)     the label claim must include the specific name of the nutrient that is an antioxidant and cannot simply say "antioxidants" (*e.g.*, "high in antioxidant vitamins C and E"),[1] *see* 21 C.F.R. § 101.54(g)(4);

---

[1] Alternatively, when used as part of a nutrient content claim, the term "antioxidant" or "antioxidants" (such as "high in antioxidants") may be linked by a symbol (such as an asterisk) that refers to the same symbol that appears elsewhere on the same panel of a product label followed by the name or names of the nutrients with the recognized antioxidant activity. If this is done, the list of nutrients must appear in letters of a type size height no smaller than the larger of one half of the type size of the largest nutrient content claim or 1/16 inch.

(4)     the nutrient that is the subject of the antioxidant claim must also have recognized antioxidant activity, *i.e.*, there must be scientific evidence that after it is eaten and absorbed from the gastrointestinal tract, the substance participates in physiological, biochemical or cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions, *see* 21 C.F.R. § 101.54(g)(2);

(5)     the antioxidant nutrient must meet the requirements for nutrient content claims in 21 C.F.R. § 101.54(b), (c), or (e) for "High" claims, "Good Source" claims, and "More" claims, respectively. For example, to use a "High" claim, the food would have to contain 20% or more of the Daily Reference Value ("DRV") or RDI per serving. For a "Good Source" claim, the food would have to contain between 10-19% of the DRV or RDI per serving, *see* 21 C.F.R. § 101.54(g)(3); and

(6)     the antioxidant nutrient claim must also comply with general nutrient content claim requirements such as those contained in 21 C.F.R. § 101.13(h) that prescribe the circumstances in which a nutrient content claim can be made on the label of products high in fat, saturated fat, cholesterol or sodium.

46.     The antioxidant labeling for Twinings' Misbranded Food Products and the claims on Twinings' website promoting these products violate California law: (1) because the names of the antioxidants are not disclosed on the product labels; (2) because there are no RDIs for the antioxidants being touted, including flavonoids and polyphenols; (3) because the claimed antioxidant nutrients fail to meet the requirements for nutrient content claims in 21 C.F.R. § 101.54(b), (c), or (e) for "High" claims, "Good Source" claims, and "More" claims, respectively; and (4) because Defendant lacks adequate scientific evidence that the claimed antioxidant nutrients participate in physiological, biochemical, or cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions after they are eaten and absorbed from the gastrointestinal tract.

47.     For example, as discussed in paragraph 5 above, the package label of Twinings' Green Tea Jasmine bears the statement *"Natural source of Antioxidants."*.Similar unlawful

statements appear on all Twinings' tea products. Additional antioxidant nutrient content claims

appear on Twinings' website.

48.    These same violations were condemned in numerous other warning letters to

other tea companies including the April 20, 2011 warning letter to Diaspora Tea & Herb Co.,

LLC (attached as Exhibit 2) which states in pertinent part:

> Additionally, your website bears nutrient content claims using the term
> "antioxidant." ... Such a claim must also include the names of the nutrients that
> are the subject of the claim as part of the claim or, alternatively, the term
> "antioxidant" or "antioxidants" may be linked by a symbol (e.g., an asterisk) that
> refers to the same symbol that appears elsewhere on the same panel of the
> product label, followed by the name or names of the nutrients with recognized
> antioxidant activity, 21 CFR 101.54(g)(4). The use of a nutrient content claim
> that uses the term "antioxidant" but does not comply with the requirements of 21
> CFR 101.54(g) misbrands a product under section 403(r)(2)(A)(i) of the Act. The
> following are examples of nutrient content claims on your website that use the
> term "antioxidant" but do not include the names of the nutrients that are the
> subject of the claim as required under 21 CFR 101.54(g)(4): "Yerba Maté
> is...rich in... antioxidants." ;  ...   "Caffeine-free Green Rooibos...contain[s]
> high concentrations of antioxidants....
>
> Additionally, the following are examples of nutrient content claims on your
> website that use the term "antioxidant," but where the nutrients that are the
> subject of the claim do not have an established RDI as required under 21 CFR
> 101.54(g)(1): ... "White Tea... contain[s] high concentrations of... antioxidant
> polyphenols (tea catechins)...." ; ... "Antioxidant rich...222mg polyphenols per
> serving!"; ... "Antioxidant rich...109mg polyphenols per serving!"□
>
> The above violations are not meant to be an all-inclusive list of deficiencies in
> your products and their labeling. It is your responsibility to ensure that products
> marketed by your firm comply with the Act and its implementing
> regulations. We urge you to review your website, product labels, and other
> labeling and promotional materials for your products to ensure that the claims
> you make for your products do not cause them to violate the Act. The Act
> authorizes the seizure of illegal products and injunctions against manufacturers
> and distributors of those products, 21 U.S.C. §§ 332 and 334

49.    For these reasons, Defendant's antioxidant claims at issue in this Complaint are

misleading and in violation of 21 C.F.R. § 101.54 and California law, and the products at issue

are misbranded as a matter of law.   Misbranded products cannot be legally manufactured,

advertised, distributed, held or sold and are legally worthless. Plaintiff and members of the Class

who purchased these products paid an unwarranted premium for these products.

50.     In addition to the FDA Warning Letters to Unilever and Diaspora Tea & Herb Co., LLC discussed above (Exhibits 1 and 2), the FDA has issued numerous warning letters addressing similar unlawful antioxidant nutrient content claims. *See, e.g.*, FDA warning letter dated February 22, 2010 to Redco Foods, Inc. regarding its misbranded Salada Naturally Decaffeinated Green Tea product because "there are no RDIs for (the antioxidants) grapeskins, rooibos (red tea) and anthocyanins"; FDA warning letter dated February 22, 2010 to Fleminger Inc. regarding its misbranded TeaForHealth products because the admonition "[d]rink high antioxidant green tea" . . . "does not include the nutrients that are the subject of the claim or use a symbol to link the term antioxidant to those nutrients". These warning letters were hardly isolated. Defendant is aware of these FDA warning letters.

51.     Additional evidence of Twinings' knowledge that its antioxidant health claims are improper and misleading is provided by the November 25, 2009 Adjudication of the British Advertising Standards Authority ("ASA") against one of Twinings' biggest competitors, Tetley Tea. There, the ASA found that Tetley's print and TV advertisements stating that Tetley products were: "rich in antioxidants that can keep your heart healthy" were misleading. In so holding, ASA stated:

> Because the evidence we had seen was not directly relevant to the implied claim that green tea, or the antioxidants in it, had general health benefits, we considered it was not sufficient substantiation for that claim. We concluded that the ad was misleading.
>
> On this point, the ad breached CAP (Broadcast) TV Advertising Standards Code rules 5.1.1 (Misleading advertising), 5.2.1 (Evidence), 5.2.2 (Implications), 8.3.1(a) (Accuracy in food advertising)
>
> The ad must not be broadcast again in its current form. We told Tetley not to imply that a product had greater health benefits than it did if they did not hold substantiation for the implied claims....
> Adjudication of the ASA Council, Tetley GB Ltd., November 25, 2009.

http://www.asa.org.uk/ASA-action/Adjudications/2009/11/Tetley-GB-Ltd/TF_ADJ_47670.aspx

52.     Further evidence of Twinings' knowledge that its antioxidant health claims are improper and misleading is provided by the September 22, 2007 Adjudication of the British

Advertising Standards Authority ("ASA") against the British Tea Council, of which Twinings is a member, finding that printed advertisements regarding the health effects of antioxidants in tea were improper and misleading. The ASA in its adjudication stated:

> We noted the advice of our expert and accepted that antioxidants, as flavonoids, were present in tea, and also that they were absorbed into the system following tea consumption. However, we were concerned that **we had not seen evidence to show definitively that health benefits provided by the antioxidant effect of flavonoid absorption, as a result of the consumption of tea, were established.**
> We considered that readers were likely to recognise the Government's 'five a day' campaign and understand that eating fruit and vegetables contributed to a healthy diet. Because the ad suggested that tea could also contribute to a healthy diet, and because we had not seen evidence to firmly substantiate any health benefit in drinking four cups of tea per day, **we considered that ad (a) exaggerated the health benefits of tea drinking.**
> ....
>
> We considered, however, that readers were likely to infer from the ad that it had been proven that antioxidants, absorbed as a result of drinking four cups of tea per day, could help to protect the body against the damaging effects of free radical action. We considered that **we had not seen substantive evidence to demonstrate that the antioxidant potential realised from the consumption of four cups of tea per day could have any effect on free radical activity; we concluded, therefore, that the claim "... We recommend 4 cups a day to contribute to a diet rich in antioxidants which could help to protect your body against the damaging effects of free radicals" was likely to mislead**

http://www.asa.org.uk/ASA-action/Adjudications/2007/9/United-Kingdom-Tea-Council/TF_ADJ_43234.aspx

53.     The types of misrepresentations made above would be considered by a reasonable consumer when deciding to purchase the products. Not only do Twinings' antioxidant, nutrient content and health claims regarding the benefits of "antioxidants" violate FDA rules and regulations, they directly contradict current scientific research, which has concluded: "[T]he evidence today does not support a direct relationship between tea consumption and a physiological AOX [antioxidant] benefit." This conclusion was reported by Dr. Jane Rycroft, Director of Lipton Tea Institute of Tea, in an article published in January, 2011, in which Dr. Rycroft states:

> Only a few scientific publications report an effect of tea on free radical damage in humans using validated biomarkers in well designed human studies. Unfortunately, the results of these studies are at variance and the majority of the studies do not report significant effects . . .

Therefore, despite more than 50 studies convincingly showing that flavonoids

possess potent antioxidant activity *in vitro*, the ability of flavonoids to act as an antioxidant *in vivo* [in humans], has not been demonstrated.

Based on the current scientific consensus that the evidence today does not support a direct relationship between tea consumption and a physiological AOX benefit...

No evidence has been provided to establish that having antioxidant activity/content and/or antioxidant properties is a beneficial physiological effect.

Rycroft, Jane, "The Antioxidant Hypothesis Needs to be Updated," Vol. 1, *Tea Quarterly Tea Science Overview,* Lipton Tea Institute of Tea Research (Jan. 2011), pp. 2-3.

54.     This scientific evidence and consensus conclusively establishes the improper nature of the Defendant's antioxidant claims as they cannot possibly satisfy the legal and regulatory requirement that the nutrient that is the subject of the antioxidant claim must also have recognized antioxidant activity, *i.e.*, there must be scientific evidence that after it is eaten and absorbed from the gastrointestinal tract, the substance participates in physiological, biochemical or cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions, *see* 21 C.F.R. § 101.54(g)(2).

55.     Plaintiff and members of the Class who purchased the Misbranded Food Products paid an unwarranted premium for these products.

### 2.     Defendant Makes Unlawful Nutritional Content Claims

56.     The FDA regulations authorize use of a limited number of defined nutrient content claims. In addition to authorizing the use of only a limited set of defined nutrient content terms on food labels, FDA's regulations authorize the use of only certain synonyms for these defined terms. If a nutrient content claim or its synonym is not included in the food labeling regulations it cannot be used on a label. Only those claims, or their synonyms, that are specifically defined in the regulations may be used. All other claims are prohibited. 21 CFR § 101.13(b).

57.     Only approved nutrient content claims will be permitted on the food label, and all other nutrient content claims will misbrand a food. It should thus be clear which type of claims are prohibited and which permitted. Manufacturers are on notice that the use of an unapproved nutrient content claim is prohibited conduct. 58 FR 2302. In addition, 21 U.S.C. §

1  343(r)(2) prohibits using unauthorized undefined terms and declares foods that do so to be

2  misbranded.

3       58.    In order to appeal to consumer preferences, Defendant has repeatedly made

4  unlawful nutrient content claims about antioxidants and other nutrients that fail to utilize one of

5  the limited defined terms. These nutrient content claims are unlawful because they failed to

6  comply with the nutrient content claim provisions in violation of 21 C.F.R. §§ 101.13 and 101.54,

7  which have been incorporated in California's Sherman Law. To the extent that the terms used to

8  describe antioxidants without a recognized daily value or RDI (such as "natural source") are

9  deemed to be a synonym for a defined term like "contain" the claim would still be unlawful

10  because, as these nutrients do not have established daily values, they cannot serve as the basis for

11  a term that has a minimum daily value threshold.

12       59.    Similarly, the regulations specify absolute and comparative levels at which foods

13  qualify to make these claims for particular nutrients (*e.g.*, low fat. . . more vitamin C.) and list

14  synonyms that may be used in lieu of the defined terms. Certain implied nutrient content claims

15  (*e.g.*, healthy) also are defined.  The daily values ("DVs") for nutrients that the FDA has

16  established for nutrition labeling purposes have application for nutrient content claims, as well.

17  Claims are defined under current regulations for use with nutrients having established DVs;

18  moreover, relative claims are defined in terms of a difference in the percent DV of a nutrient

19  provided by one food as compared to another. *See. e.g.* 21 C.F.R. §§ 101.13 and 101.54.

20       60.    Defendant has repeatedly made unlawful nutrient content claims about

21  antioxidants and other nutrients that fail to utilize one of the limited defined terms appropriately.

22  These nutrient content claims are unlawful because they fail to comply with the nutrient content

23  claim provisions in violation of 21 C.F.R. §§ 101.13 and 101.54, which have been incorporated in

24  California's Sherman Law.

25       61.    For example, Twinings' claims on its website such as "white tea contains the

26  highest levels of antioxidants", or "ideal source of antioxidants" or "Green tea is naturally rich in

27  antioxidants" or "Tea is also a rich source of potassium" are unlawful. Moreover, Twinings'

28

claims on its product labels that its tea products "natural source of antioxidants" are unlawful. Defendant's teas do not meet the minimum nutrient level threshold to make such a claim.

62.    These very same violations over nutrient content claims for tea products were condemned in the FDA Warning Letter to Unilever/Lipton discussed above and attached as Exhibit 1. In the warning letter to Unilever, the FDA stated:

> The product label back panel includes the statement "packed with protective FLAVONOID ANTIOXIDANTS." The term "packed with" characterizes the level of flavonoid antioxidants in the product; therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "packed with" could be considered a synonym for a term defined by regulation, nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). **The claim "packed with FLAVONOID ANTIOXIDANTS" does not comply with 21 CFR 101.54(g)1) because no RDI has been established for flavonoids. Thus, this unauthorized nutrient content claim causes your product to be misbranded** under section 403(r)(2)(A)(i) of the Act.

Just as the FDA found Unilever's use of the phrase "packed with flavonoid antioxidants" to be in violation of law, Twinings' use on its website and/or package labels of terms such as "highest levels of antioxidants", "ideal source of antioxidants", "naturally rich in antioxidants," "rich source of potassium", or "natural source of antioxidants" are in violation of law. Therefore, as with Unilever, such a violation causes Twinings' products "to be misbranded under section 403(r)(2)(A)(i) of the Act".

63.    The nutrient content claims regulations discussed above are intended to ensure that consumers are not misled as to the actual or relative levels of nutrients in food products.

64.    Defendant has violated these referenced regulations. Therefore, Defendant's Misbranded Food Products are misbranded as a matter of federal and California law and cannot be sold or held because they are legally worthless. Defendant has also violated 21 C.F.R. § 101.54(g)(1), which prohibits food manufacturers from making claims regarding the nutritional value of their products when the products fail to disclose that no RDI has been established for the touted nutrients.

65.    For example, Twinings' Misbranded Food Products claims as set out above regarding the presence of antioxidants in tea, but no RDI has been established for any antioxidant nutrient in its tea products, including flavonoids, polyphenols or ECGC.  Thus, these products violate 21 C.F.R. § 101.54(g)(1).

66.    Claims that Twinings' products contain or are made with an ingredient such as tea that is represented to contain a particular nutrient, or is prepared in a way that affects the content of a particular nutrient in the food, can only be made if it at least a "good source" of the nutrient that is associated with the ingredient or type of preparation. Thus, Twinings' statements set out above trigger a "good source" requirement (10 percent or more of the RDI or the DRV per reference amount customarily consumed) which tea cannot demonstrate. 21 C.F.R. § 101.65(c)(3).

67.    The type of misrepresentations made above would be considered by a reasonable consumer when deciding to purchase Defendant's Misbranded Food Products.  The failure to comply with the labeling requirements of 21 C.F.R. § 101.54 renders Defendant's products misbranded as a matter of federal and California law.

68.    In addition, 21 C.F.R. § 101.65, which has been adopted by California, sets certain minimum nutritional requirements for making an implied nutrient content claim that a product is healthy.  For example, for unspecified foods, the food must contain at least 10 percent of the RDI of one or more specified nutrients.  Defendant has misrepresented the healthiness of their products while failing to meet the regulatory requirements for making such claims.

69.    Plaintiff and members of the Class who purchased the Misbranded Food Products paid an unwarranted premium for these products.

### 3.    Defendant Makes Unlawful Health Claims

70.    A health claim is a statement expressly or implicitly linking the consumption of a food substance (*e.g.*, ingredient, nutrient, or complete food) to risk of a disease (*e.g.*, cardiovascular disease) or a health-related condition (*e.g.*, hypertension). *See* 21 C.F.R. § 101.14(a)(1), (a)(2), and (a)(5). Only health claims made in accordance with FDCA requirements, or authorized by FDA as qualified health claims, may be included in food labeling. Other express

or implied statements that constitute health claims, but that do not meet statutory requirements, are prohibited in labeling foods.

71.    21 C.F.R. § 101.14, which has been expressly adopted by California, provides when and how a manufacturer may make a health claim about its product. A "Health Claim" means any claim made on the label or in labeling of a food, including a dietary supplement, that expressly or by implication, including "third party" references, written statements (e.g., a brand name including a term such as "heart"), symbols (e.g., a heart symbol), or vignettes, characterizes the relationship of any substance to a disease or health-related condition. Implied health claims include those statements, symbols, vignettes, or other forms of communication that suggest, within the context in which they are presented, that a relationship exists between the presence or level of a substance in the food and a disease or health-related condition (see 21 CFR § 101.14(a)(1)).

72.    Further, health claims are limited to claims about disease risk reduction, and cannot be claims about the diagnosis, cure, mitigation, or treatment of disease. An example of an authorized health claim is: "Three grams of soluble fiber from oatmeal daily in a diet low in saturated fat and cholesterol may reduce the risk of heart disease. This cereal has 2 grams per serving."

73.    A claim that a substance may be used in the diagnosis, cure, mitigation, treatment, or prevention of a disease is a drug claim and may not be made for a food. 21 U.S.C. § 321(g)(1)(D).

74.    The use of the term "healthy" is not a health claim but rather an implied nutrient content claim about general nutrition that is defined by FDA regulation. In general, the term may be used in labeling an individual food product that:

Qualifies as both low fat and low saturated fat;

Contains 480 mg or less of sodium per reference amount and per labeled serving, and per 50 g (as prepared for typically rehydrated foods) if the food has a reference amount of 30 g or 2 tbsps or less;

Does not exceed the disclosure level for cholesterol (e.g., for most individual food products, 60 mg or less per

reference amount and per labeled serving size); *and*

Except for raw fruits and vegetables, certain frozen or
canned fruits and vegetables, and enriched cereal-grain
products that conform to a standard of identity, provides at
least 10% of the daily value (DV) of vitamin A, vitamin C,
calcium, iron, protein, *or* fiber per reference amount.
Where eligibility is based on a nutrient that has been added
to the food, such fortification must comply with FDA's
fortification policy.

21 C.F.R. § 101.65(d)(2).  The FDA's definition applies separate criteria to use of healthy on raw,

single ingredient seafood or game meat products. 21 C.F.R. § 101.65(d)(2)(ii).  FDA's regulation

on healthy also encompasses other, derivative uses of health (*e.g.*, healthful, healthier) in food

labeling. 21 C.F.R. § 101.65(d).

  75. The numerous claimed health benefits appearing on Twinings' website are in

violation of the aforesaid laws. For example, in addition to the claims set out above in paragraph

3, on its website Twinings states (emphasis added):

First discovered in China over 5,000 years ago, green tea is said to have many
health benefits, including boosting your immune system. White tea contains the
highest levels of antioxidants, and has been found to increase metabolism and
help maintain healthy skin and complexion. Herbal teas, such as chamomile, can
help you relax and promote restful sleep and help with digestion.
Black and green teas also contain Vitamins A, B1, B2 and B6, along with
calcium, zinc and folic acid. Tea is also a rich source of potassium—vital for
maintaining a normal heartbeat and regulating fluid levels in cells and manganese,
an essential mineral for bone growth.
....

**Smile more** - Tea is a natural source of fluoride, which helps make your teeth
stronger. Studies have shown that people who regularly drink both black and/or
green tea are less likely to have cavities. The flavonoids in tea also help stop
plaque, which can prevent gum disease and reduce bad breath.
**Combat free radicals** - Tea is an ideal source of antioxidants, which naturally
help protect the body against the damaging effects of free radicals. Free radicals
are highly reactive molecules that can damage our cells and cause diseases.
**Discover healing herbals** - Naturally caffeine free and low in calories, these
refreshing infusions of fruits, flowers or herbs can help you unwind, relax, revive,
or detox.
....
Tea is a healthy beverage. Rich in antioxidants, refreshing and less than 1 calorie
per serving if you don't add sugar or milk

http://www.twiningsusa.com/template.php?id=22

It's great when something you love is also good for you - such as drinking tea!
Over the years, there have been numerous reports about the benefits of tea.

The main one being that they're a good source of antioxidants - 'flavonoid antioxidants' to be exact. As well as tea, you can also find them naturally in foods such as fruit and vegetables.

Along with other antioxidants like vitamin C, vitamin A and chlorophyll, flavonoid antioxidants can help keep our body's cells and tissues healthy by mopping up 'free radicals' - atoms or molecules with unpaired electrons, hence 'free'. Although all living organisms make free radicals, they're also present in things like pollution. And while we all need free radicals, a build-up in our bodies can damage cells and DNA. So that's a big thumbs up for tea!

It's great when something you love is also good for you - such as drinking tea! Over the years, there have been numerous reports about the benefits of tea.

The main one being that they're a good source of antioxidants - 'flavonoid antioxidants' to be exact. As well as tea, you can also find them naturally in foods such as fruit and vegetables.

Along with other antioxidants like vitamin C, vitamin A and chlorophyll, flavonoid antioxidants can help keep our body's cells and tissues healthy by mopping up 'free radicals' - atoms or molecules with unpaired electrons, hence 'free'. Although all living organisms make free radicals, they're also present in things like pollution. And while we all need free radicals, a build-up in our bodies can damage cells and DNA. So that's a big thumbs up for tea!

http://www.twinings.co.uk/about-our-tea/benefits-of-tea

76.     As FDA found in regard to the therapeutic claims made by Unilever/Lipton and Diaspora Tea & Herb Co. discussed above, the therapeutic claims on Twinings' website and on its labels establish that their products are drugs because they are intended for use in the cure, mitigation, treatment, or prevention of disease. Twinings' Misbranded Food Products are not generally recognized as safe and effective for the above referenced uses and, therefore, the products are "new drugs" which may not be legally marketed in the U.S.

77.     As discussed above and as shown in Exhibits 1 and 2, the FDA has conducted reviews of similar products to Twinings' tea products and concluded that those companies were "in violation of the Federal Food, Drug, and Cosmetic Act ... and the applicable regulations in Title 21, Code of Federal Regulations, Part 101 (21 CFR 101)." FDA found the products to be misbranded stating, "Your product is offered for conditions that are not amenable to self-diagnosis and treatment by individuals who are not medical practitioners; therefore, adequate directions for use cannot be written so that a layperson can use this drug safely for its intended

purposes. Thus, your … product is misbranded under section 502(f)(1) of the Act in that the labeling for this drug fails to bear adequate directions for use [21 U.S.C. § 352(f)(1)]." *See* Exhibits 1 and 2.

78. The package front panel of Twinings' Misbranded Food Products claims "*natural source of antioxidants*" and its web sites claim "highest levels of antioxidants", "ideal source of antioxidants", "naturally rich in antioxidants", "rich source of potassium", or "natural source of antioxidants" but their products do not contain any antioxidant substance or nutrient with an established RDI or an RDI in a sufficient level to make such a claim. As set out above Twinings also makes various health related claims on its website of health benefits to be derived from using its products but, as with the Lipton and Diaspora Tea & Herb Co. products, such health related claims are unlawful.

79. Defendant has manufactured, advertised, distributed and sold products that are misbranded under California law. Misbranded products cannot be legally manufactured, advertised, distributed or sold and are legally worthless as a matter of law.

80. Plaintiff and members of the Class who purchased the Misbranded Food Products paid an unwarranted premium for these products.

**D.   Defendant Has Violated California Law**

81. Defendant has violated California Health & Safety Code §§ 109885 and 110390 which make it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product.

82. Defendant has violated California Health & Safety Code § 110395 which makes it unlawful to manufacture, sell, deliver, hold or offer to sell any misbranded food.

83. Defendant has violated California Health & Safety Code § 110398 which makes it unlawful to deliver or proffer for delivery any food that has been falsely advertised.

84. Defendant has violated California Health & Safety Code § 110660 because its labeling is false and misleading in one or more ways, as follows:

a.      They are misbranded under California Health & Safety Code § 110665 because their labeling fails to conform to the requirements for nutrient labeling set forth in 21 U.S.C. § 343(q) and the regulations adopted thereto;

b.      They are misbranded under California Health & Safety Code § 110670 because their labeling fails to conform with the requirements for nutrient content and health claims set forth in 21 U.S.C. § 343(r) and the regulations adopted thereto; and

c.      They are misbranded under California Health & Safety Code § 110705 because words, statements and other information required by the Sherman Law to appear on their labeling either are missing or not sufficiently conspicuous.

85.    Defendant has violated California Health & Safety Code § 110760 which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded.

86.    Defendant has violated California Health & Safety Code § 110765 which makes it unlawful for any person to misbrand any food.

87.    Defendant has violated California Health & Safety Code § 110770 which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for deliver any such food.

88.    Defendant has violated the standard set by 21 C.F.R. § 101.2, which has been incorporated by reference in the Sherman Law, by failing to include on their product labels the nutritional information required by law.

89.    Defendant has violated the standards set by 21 CFR §§ 101.13, and 101.54, which have been adopted by reference in the Sherman Law, by including unauthorized antioxidant claims on their products. Defendant has violated the standards set by 21 CFR §§ 101.14, and 101.65, which have been adopted by reference in the Sherman Law, by including unauthorized health and healthy claims on their products.

E.     **Plaintiff Purchased Defendant's Misbranded Food Products**

90.    Plaintiff cares about the nutritional content of food and seeks to maintain a healthy diet.

91.    Plaintiff purchased Defendant's Misbranded Food Products at issue in this Complaint during the Class Period including the following product:

Green Tea





92.    Plaintiff read the labels on Defendant's Misbranded Food Products, including the antioxidant claims, where applicable, before purchasing them. Absent the unlawful claims Plaintiff would have foregone purchasing Defendant's products and bought other products readily available at a lower price.

93.    Plaintiff relied on Defendant's package labeling including the "*natural source of antioxidants*" claim, and based and justified the decision to purchase Defendant's products in substantial part on Defendant's package labeling including the antioxidant claim.

94.    At point of sale, Plaintiff did not know, and had no reason to know, that Defendant's products were misbranded as set forth herein, and would not have bought the products had Plaintiff known the truth about them.

95.    At point of sale, Plaintiff did not know, and had no reason to know, that Defendant's antioxidant, nutrient content and health labeling claims were unlawful and unauthorized as set forth herein, and would not have bought the products had Plaintiff known the truth about them.

96.    As a result of Defendant's unlawful labeling claims including the antioxidant, nutrient content and health labeling claims including the "natural source of antioxidants" claims, Plaintiff and thousands of others in California purchased the products at issue.

97.    Defendant's labeling, advertising and marketing as alleged herein is false and misleading and designed to increase sales of the products at issue.    Defendant's misrepresentations are part of an extensive labeling, advertising and marketing campaign, and a reasonable person would attach importance to Defendant's representations in determining whether to purchase the products at issue.

98.    A reasonable person would also attach importance to whether Defendant's products were legally salable, and capable of legal possession, and to Defendant's representations about these issues in determining whether to purchase the products at issue. Plaintiff would not have purchased Defendant's Misbranded Food Products had Plaintiff known they were not capable of being legally sold or held.

**CLASS ACTION ALLEGATIONS**

99.     Plaintiff brings this action as a class action pursuant to Federal Rule of Procedure 23(b)(2) and 23(b)(3) on behalf of the following class:

> All persons in California who purchased Twinings' tea products within the last four years (the "Class").

100.    The following persons are expressly excluded from the Class:  (1) Defendant and its subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the Court to which this case is assigned and its staff.

101.    This action can be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

102.    <u>Numerosity</u>:  Based upon Defendant's publicly available sales data with respect to the misbranded products at issue, it is estimated that the Class numbers in the thousands, and that joinder of all Class members is impracticable.

103.    <u>Common Questions Predominate</u>:  This action involves common questions of law and fact applicable to each Class member that predominate over questions that affect only individual Class members.  Thus, proof of a common set of facts will establish the right of each Class member to recover.  Questions of law and fact common to each Class member include, for example:

a.      Whether Defendant engaged in unlawful and misleading business practices by failing to properly package and label their Misbranded Food Products sold to consumers;

b.      Whether the food products at issue were misbranded or unlawfully packaged and labeled as a matter of law;

c.      Whether Defendant made unlawful and misleading antioxidant claims with respect to their food products sold to consumers;

d.      Whether Defendant made unlawful and misleading nutrient content and health claims with respect to their food products sold to consumers;

e.      Whether Defendant violated California Bus. & Prof. Code § 17200, *et seq.*, California Bus. & Prof. Code § 17500, *et seq.*, the Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*, California Civ. Code § 1790, *et seq.*, 15 U.S.C. § 2301, *et seq.*, and the Sherman Law;

f.   Whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;

g.   Whether Defendant's unlawful, unfair and/or deceptive practices harmed Plaintiff and the Class; and

h.   Whether Defendant was unjustly enriched by their deceptive practices.

104.   Typicality:   Plaintiff's claims are typical of the claims of the Class because Plaintiff bought Defendant's Misbranded Food Products during the Class Period.   Defendant's unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were received.   Plaintiff and the Class sustained similar injuries arising out of Defendant's conduct in violation of California law.   The injuries of each member of the Class were caused directly by Defendant's wrongful conduct.   In addition, the factual underpinning of Defendant's misconduct is common to all Class members and represents a common thread of misconduct resulting in injury to all members of the Class.   Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the Class members and are based on the same legal theories.

105.   Adequacy:   Plaintiff will fairly and adequately protect the interests of the Class. Neither Plaintiff nor Plaintiff's counsel have any interests that conflict with or are antagonistic to the interests of the Class members.   Plaintiff has retained highly competent and experienced class action attorneys to represent their interests and those of the members of the Class.   Plaintiff and Plaintiff's counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

106.   Superiority:   There is no plain, speedy or adequate remedy other than by maintenance of this class action.   The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties.   Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently

and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  Further, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.   Class treatment of common questions of law and fact would also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the Court and the litigants, and will promote consistency and efficiency of adjudication.

107.    The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

108.    The prerequisites to maintaining a class action pursuant to Fed. R. Civ. P. 23(b)(3) are met as questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

109.    Plaintiff and Plaintiff's counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Business and Professions Code § 17200, *et seq.***
**Unlawful Business Acts and Practices**

110.    Plaintiff incorporates by reference each allegation set forth above.

111.    Defendant's conduct constitutes unlawful business acts and practices.

112.    Defendant sold Misbranded Food Products in California during the Class Period.

113.    Defendant is a corporation and, therefore, each is a "person" within the meaning of the Sherman Law.

114.   Defendant's business practices are unlawful under § 17200, *et seq*. by virtue of Defendant's violations of Article 6 (misbranded food) of the Sherman Law.

115.   Defendant's business practices are unlawful under § 17200, *et seq*. by virtue of Defendant's violations of § 17500, *et seq*., which forbids untrue and misleading advertising.

116.   Defendant sold Plaintiff and the Class Misbranded Food Products that were not capable of being sold legally and which were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

117.   As a result of Defendant's illegal business practices, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and to restore to any Class Member any money paid for the Misbranded Food Products.

118.   Defendant's unlawful business acts present a threat and reasonable continued likelihood of deception to Plaintiff and the Class.

119.   As a result of Defendant's conduct, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiff and the Class.

**SECOND CAUSE OF ACTION**
**Business and Professions Code § 17200, *et seq*.**
**<u>Unfair Business Acts and Practices</u>**

120.   Plaintiff incorporates by reference each allegation set forth above.

121.   Defendant's conduct as set forth herein constitutes unfair business acts and practices.

122.   Defendant sold Misbranded Food Products in California during the Class Period.

123.   Plaintiff and members of the Class suffered a substantial injury by virtue of buying Defendant's Misbranded Food Products that they would not have purchased absent Defendant's illegal conduct as set forth herein.

- 33 -
*Class Action Complaint*

124.    Defendant's deceptive marketing, advertising, packaging and labeling of its Misbranded Food Products was of no benefit to consumers, and the harm to consumers and competition is substantial.

125.    Defendant sold Plaintiff and the Class Misbranded Food Products that were not capable of being legally sold and that were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

126.    Plaintiff and the Class who purchased Defendant's Misbranded Food Products had no way of reasonably knowing that the products were not properly  marketed, advertised, packaged and labeled, and thus could not have reasonably avoided the injury each of them suffered.

127.    The consequences of Defendant's conduct as set forth herein outweighs any justification, motive or reason therefor.  Defendant's conduct is and continues to be illegal and contrary to public policy, and is substantially injurious to Plaintiff and the Class.

128.    As a result of Defendant's conduct, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiff and the Class.

### THIRD CAUSE OF ACTION
### Business and Professions Code § 17200, *et seq.*
### <u>Fraudulent Business Acts and Practices</u>

129.    Plaintiff incorporates by reference each allegation set forth above.

130.    Defendant's conduct as set forth herein constitutes fraudulent business practices under California Business and Professions Code sections § 17200, *et seq.*  Defendant sold Misbranded Food Products in California during the Class Period.

131.    Defendant's misleading marketing, advertising, packaging and labeling of the Misbranded Food Products was likely to deceive reasonable consumers, and in fact, Plaintiff and

members of the Class were deceived.  Defendant has engaged in fraudulent business acts and practices.

132.    Defendant's fraud and deception caused Plaintiff and the Class to purchase Defendant's Misbranded Food Products that they would otherwise not have purchased had they known the true nature of those products.

133.    Defendant sold Plaintiff and the Class Misbranded Food Products that were not capable of being sold legally and that were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

134.    As a result of Defendant's conduct as set forth herein, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiff and the Class.

## FOURTH CAUSE OF ACTION
### Business and Professions Code § 17500, *et seq.*
### <u>Misleading and Deceptive Advertising</u>

135.    Plaintiff incorporates by reference each allegation set forth above.

136.    Plaintiff asserts this cause of action for violations of California Business and Professions Code § 17500, *et seq*. for misleading and deceptive advertising against Defendant.

137.    Defendant sold Misbranded Food Products in California during the Class Period.

138.    Defendant engaged in a scheme of offering Misbranded Food Products for sale to Plaintiff and members of the Class by way of, *inter alia*, product packaging and labeling, and other promotional materials.  These materials misrepresented and/or omitted the true contents and nature of Defendant's Misbranded Food Products.  Defendant's advertisements and inducements were made within California and come within the definition of advertising as contained in Business and Professions Code §17500, *et seq*. in that such product packaging and labeling, and promotional materials were intended as inducements to purchase Defendant's Misbranded Food Products and are statements disseminated by Defendant to Plaintiff and the Class that were

1  intended to reach members of the Class. Defendant knew that these statements were misleading

2  and deceptive as set forth herein.

3       139.   In furtherance of their plan and scheme, Defendant prepared and distributed within

4  California and nationwide via product packaging and labeling, and other promotional materials,

5  statements that misleadingly and deceptively represented the ingredients contained in and the

6  nature of Defendant's Misbranded Food Products. Plaintiff and the Class necessarily and

7  reasonably relied on Defendant's materials, and were the intended targets of such representations.

8       140.   Defendant's conduct in disseminating misleading and deceptive statements in

9  California and nationwide to Plaintiff and the Class was and is likely to deceive reasonable

10  consumers by obfuscating the true ingredients and nature of Defendant's Misbranded Food

11  Products in violation of the "misleading prong" of California Business and Professions Code §

12  17500, *et seq.*

13       141.   As a result of Defendant's violations of the "misleading prong" of California

14  Business and Professions Code § 17500, *et seq.*, Defendant has been unjustly enriched at the

15  expense of Plaintiff and the Class. Misbranded products cannot be legally sold and are legally

16  worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

17

18       142.   Plaintiff and the Class, pursuant to Business and Professions Code § 17535, are

19  entitled to an order enjoining such future conduct by Defendant, and such other orders and

20  judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any

21  money paid for Defendant's Misbranded Food Products by Plaintiff and the Class.

22

23  **FIFTH CAUSE OF ACTION**<br>**Business and Professions Code § 17500, *et seq.***<br>**<u>Untrue Advertising</u>**

24

25       143.   Plaintiff incorporates by reference each allegation set forth above.

26       144.   Plaintiff asserts this cause of action against Defendant for violations of California

27  Business and Professions Code § 17500, *et seq.*, regarding untrue advertising.

28       145.   Defendant sold Misbranded Food Products in California during the Class Period.

146.     Defendant engaged in a scheme of offering Misbranded Food Products for sale to Plaintiff and the Class by way of product packaging and labeling, and other promotional materials.     These materials misrepresented and/or omitted the true contents and nature of Defendant's Misbranded Food Products.     Defendant's advertisements and inducements were made in California and come within the definition of advertising as contained in Business and Professions Code §17500, *et seq.* in that the product packaging and labeling, and promotional materials were intended as inducements to purchase Defendant's Misbranded Food Products, and are statements disseminated by Defendant to Plaintiff and the Class.     Defendant knew that these statements were untrue.

147.     In furtherance of their plan and scheme, Defendant prepared and distributed in California and nationwide via product packaging and labeling, and other promotional materials, statements that falsely advertise the ingredients contained in Defendant's Misbranded Food Products, and falsely misrepresented the nature of those products.     Plaintiff and the Class were the intended targets of such representations and would reasonably be deceived by Defendant's materials.

148.     Defendant's conduct in disseminating untrue advertising throughout California and nationwide deceived Plaintiff and members of the Class by obfuscating the contents, nature and quality of Defendant's Misbranded Food Products in violation of the "untrue prong" of California Business and Professions Code § 17500.

149.     As a result of Defendant's violations of the "untrue prong" of California Business and Professions Code § 17500, *et seq.*, Defendant has been unjustly enriched at the expense of Plaintiff and the Class.     Misbranded products cannot be legally sold and are legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

150.     Plaintiff and the Class, pursuant to Business and Professions Code § 17535, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiff and the Class.

## SIXTH CAUSE OF ACTION
### Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*

151.    Plaintiff incorporates by reference each allegation set forth above.

152.    This cause of action is brought pursuant to the CLRA.   This cause of action does not currently seek monetary relief and is limited solely to injunctive relief.   Plaintiff intends to amend this Complaint to seek monetary relief in accordance with the CLRA after providing Defendant with notice pursuant to Cal. Civ. Code § 1782.

153.    At the time of any amendment seeking damages under the CLRA, Plaintiff will demonstrate that the violations of the CLRA by Defendant were willful, oppressive and fraudulent, thus supporting an award of punitive damages.

154.    Consequently, Plaintiff and the Class will be entitled to actual and punitive damages against Defendant for its violations of the CLRA.   In addition, pursuant to Cal. Civ. Code § 1782(a)(2), Plaintiff and the Class will be entitled to an order enjoining the above-described acts and practices, providing restitution to Plaintiff and the Class, ordering payment of costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court pursuant to Cal. Civ. Code § 1780.

155.    Defendant's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale of goods or services to consumers.

156.    Defendant sold Misbranded Food Products in California during the Class Period.

157.    Plaintiff and members of the Class are "consumers" as that term is defined by the CLRA in Cal. Civ. Code §1761(d).

158.    Defendant's Misbranded Food Products were and are "goods" within the meaning of Cal. Civ. Code §1761(a).

159.    By engaging in the conduct set forth herein, Defendant violated and continues to violate Sections 1770(a)(5), (7) (9), and (16) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices in that they misrepresent the particular ingredients, characteristics, uses, benefits and quantities of the goods.

160.    By engaging in the conduct set forth herein, Defendant violated and continues to violate Section 1770(a)(7) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices in that they misrepresent the particular standard, quality or grade of the goods.

161.    By engaging in the conduct set forth herein, Defendant violated and continues to violate Section 1770(a)(9) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices in that they advertise goods with the intent not to sell the goods as advertised.

162.    By engaging in the conduct set forth herein, Defendant has violated and continues to violate Section 1770(a)(16) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices in that they represent that a subject of a transaction has been supplied in accordance with a previous representation when they have not.

163.    Plaintiff requests that the Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to Cal. Civ. Code § 1780(a)(2).  If Defendant is not restrained from engaging in these practices in the future, Plaintiff and the Class will continue to suffer harm.

## SEVENTH CAUSE OF ACTION
### Restitution Based on Unjust Enrichment/Quasi-Contract

164.    Plaintiff incorporates by reference each allegation set forth above.  As a result of Defendant's unlawful, fraudulent and misleading labeling, advertising, marketing and sales of Defendant's Misbranded Food Products, Defendant was enriched at the expense of Plaintiff and the Class.

165.    Defendant sold Misbranded Food Products to Plaintiff and the Class that were not capable of being sold or held legally and which were legally worthless.  It would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits they received from Plaintiff and the Class, in light of the fact that the products were not what Defendant purported them to be.  Thus, it would be unjust and inequitable for Defendant to retain the benefit

1    without restitution to Plaintiff and the Class of all monies paid to Defendant for the products at
2    issue.

3         166.   As a direct and proximate result of Defendant's actions, Plaintiff and the Class
4    have suffered damages in an amount to be proven at trial.

5                        **EIGHTH CAUSE OF ACTION**
6                **Beverly-Song Act (Cal. Civ. Code § 1790, _et seq._)**

7         167.   Plaintiff incorporates by reference each allegation set forth above.

8         168.   Plaintiff and members of the Class are "buyers" as defined by Cal. Civ. Code §
9    1791(b).

10        169.   Defendant is a "manufacturer" and "seller" as defined by Cal. Civ. Code § 1791(j)
11   & (l).

12        170.   Defendant's food products are "consumables" as defined by Cal. Civ. Code §
13   1791(d).

14        171.   Defendant's nutrient and health content claims constitute "express warranties" as
15   defined by Cal. Civ. Code § 1791.2.

16        172.   Defendant, through its package labels, creates express warranties by making the
17   affirmation of fact and promising that their Misbranded Food Products comply with food labeling
18   regulations under federal and California law.

19        173.   Despite Defendant's express warranties regarding their food products, it does not
20   comply with food labeling regulations under federal and California law.

21        174.   Defendant breached its express warranties regarding its Misbranded Food Products
22   in violation of Cal. Civ. Code § 1790, _et seq._

23        175.   Defendant sold Plaintiff and members of the Class Misbranded Food Products that
24   were not capable of being sold or held legally and which were legally worthless. Plaintiff and the
25   Class paid a premium price for the Misbranded Food Products.

26        176.   As a direct and proximate result of Defendant's actions, Plaintiff and the Class
27   have suffered damages in an amount to be proven at trial pursuant to Cal. Civ. Code § 1794.

28

177.    Defendant's breaches of warranty were willful, warranting the recovery of civil penalties pursuant to Cal. Civ. Code § 1794.

### NINTH CAUSE OF ACTION
### Magnuson-Moss Act (15 U.S.C. § 2301, *et seq.*)

178.    Plaintiff incorporates by reference each allegation set forth above.

179.    Plaintiff and members of the Class are "consumers" as defined by 15 U.S.C. § 2301(3).

180.    Defendant is a "supplier" and "warrantor" as defined by 15 U.S.C. § 2301(4) & (5).

181.    Defendant's food products are "consumer products" as defined by 15 U.S.C. § 2301(1).

182.    Defendant's nutrient and health content claims constitute "express warranties."

183.    Defendant, through its package labels, creates express warranties by making the affirmation of fact and promising that its Misbranded Food Products comply with food labeling regulations under federal and California law.

184.    Despite Defendant's express warranties regarding their food products, it does not comply with food labeling regulations under federal and California law.

185.    Defendant breached its express warranties regarding their Misbranded Food Products in violation of 15 U.S.C. §§ 2301, *et seq.*

186.    Defendant sold Plaintiff and members of the Class Misbranded Food Products that were not capable of being sold or held legally and which were legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

187.    As a direct and proximate result of Defendant's actions, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

### JURY DEMAND

Plaintiff hereby demands a trial by jury of Plaintiff's claims.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, and on