1   Ben F. Pierce Gore (SBN 128515)
    PRATT & ASSOCIATES
2   1871 The Alameda
    Suite 425
3   San Jose, CA  95126
    (408) 369-0800
4   pgore@prattattorneys.com

5   *Attorneys for Plaintiff*

6                  UNITED STATES DISTRICT COURT

7               NORTHERN DISTRICT OF CALIFORNIA

8                      SAN JOSE DIVISION

9
    NANCY LANOVAZ, individually and on          Case No.  5:12-cv-02646-RMW
10  behalf of all others similarly situated,
                                                 **AMENDED CLASS ACTION AND**
11              Plaintiff,                        **REPRESENTATIVE ACTION**

12  v.                                           **THIRD AMENDED COMPLAINT FOR**
                                                 **DAMAGES, EQUITABLE AND**
13  TWININGS OF NORTH AMERICA, INC.,             **INJUNCTIVE RELIEF**

14              Defendant.                        **JURY TRIAL DEMANDED**

15

16          Plaintiff, through her undersigned attorneys, brings this lawsuit against Defendant as to

17  her own acts upon personal knowledge and as to all other matters upon information and belief.  In

18  order to remedy the harm arising from Defendant's illegal conduct, which has resulted in unjust

19  profits, Plaintiff brings this action on behalf of a class of all persons in California who, since May

20  2, 2008 to the present (the "Class Period"), purchased Defendant's green, black, and white tea

21  products for personal or household use ("Misbranded Food Products").

22                            **INTRODUCTION**

23          1.       Every day, millions of Americans purchase and consume packaged foods.  In order

24  to protect these consumers, identical federal and California laws require truthful, accurate

25  information on the labels of packaged foods.  This case is about a company that flouts those laws

26  even after companies with identical products with similar claims on their labels received warning

27  letters from the FDA notifying those companies that their products were misbranded.  The

28

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02646 (RMW)

Defendant was and is fully aware of these laws as well as FDA guidance documents on the subjects, and the aforementioned warning letters. The law is clear: misbranded food cannot legally be manufactured, held, advertised, distributed or sold.  Misbranded food has no economic value and is worthless as a matter of law, and purchasers of misbranded food are entitled to a refund of their purchase price or other relief and compensation as determined by this Court.

2.     Defendant Twinings of North America, Inc. (hereinafter "Twinings" or "Defendant") is a tea company based in Clifton, New Jersey. Twinings is a wholly owned subsidiary of Associated British Foods which is based in London, England. It markets over 50 varieties of tea, including green, black, red, and white teas.

3.     Twinings recognizes that health claims drive sales. It actively promotes the presence of antioxidants and other nutrients in its tea products and the alleged health benefits from using these products. It does this on its product labels, its product labeling which includes the website referenced on its product packaging, and its press releases and other marketing and advertising materials. For example, on its website Twinings states (emphasis added):

> You might not have heard of them, but flavonoid antioxidants are naturally present in lots of food, including fruit, vegetables and tea.
>
> Along with other antioxidants like vitamin C, vitamin A and chlorophyll, **flavonoid antioxidants can help to keep cells and tissues healthy**.
>
> They do this by mopping up free radicals—atoms or molecules with unpaired electrons. Free radicals are made by all living organisms, but they're also in things like pollution. While we all need free radicals, a build-up in our bodies can damage cells and DNA.
>
> .... Green tea is naturally **rich in antioxidants** that may help protect the body from damage caused by free radicals.
>
> ….
>
> Did you know: **Tea is a healthy beverage. Rich in antioxidants**, refreshing and less than 1calorie per serving if you don't add sugar or milk.

http://www.twiningsusa.com/template.php?id=22.

4.     Twinings makes unlawful (i) health claims, (ii) nutrient content claims and (iii) antioxidant related nutrient content claims directly on packages of the Misbranded Food Products.

5.      All Misbranded Food Products are substantially similar.  The products are of a single kind (tea). According to the Defendant all products come from the same plant—Camellia sinensis. The process used (fermentation, oxidation, etc.) determines classification of the tea (green, black, white or red).   The only difference is flavor. All of Twinings' green, black and white tea products share the same size and shape packaging.

6.      Substantially similar unlawful antioxidant related nutrient content claims appear on the labels of each of these Misbranded Food Products and in claims on its website which Plaintiff reviewed at various times during the Class Period.

**<u>GREEN TEA</u>**

7.      Defendant has sold at least the following green tea products in the Class Period:

> Green Tea
> Camomile Green Tea
> Mint Green Tea
> Gunpowder Green Tea
> Green Tea with Jasmine 100% Organic & Fair Trade Certified
> Green Tea with Mint Organic & Fair Trade Certified
> Jasmine Green Tea
> Lemon Green Tea
> Lemon Green Tea
> Cranberry Green Tea
> Pure Green 100% Organic & Fair Trade Certified
> Green Tea with a hint of Citrus Organic & Fair Trade Certified
> Green Tea Decaffeinated
> Green Tea with Mint Cold Brewed Iced Tea

The label of each green tea product listed in this paragraph, including Twinings' Green Tea, Green Tea Decaffeinated, and  Jasmine Green Tea (all purchased by Plaintiff), bear the statement "*Natural Source of Antioxidants.*" Attached hereto as Exhibit 1 is a compilation of pictures of Twinings green tea products as depicted on its website showing that each product has the same unlawful *"Natural Source of Antioxidants"* claim in a banner across the top left of the front of the package. Such claims have been repeatedly targeted by the FDA as unlawful for tea and other food products.  Additionally, upon information and belief, the label of all green tea products, including Twinings' Jasmine Green Tea  purchased by Plaintiff unlawfully boasts "*A natural source of protective antioxidants and blended using only 100% natural ingredients, Twinings Green Tea provides a great tasting and healthy tea experience.*" This same unlawful claim

1    appears on all the other Twinings green tea products as well. Such claims have been repeatedly

2    targeted by the FDA as unlawful for tea and other food products.  Plaintiff saw and relied on these

3    claims and they influenced her purchase decisions.

**LABEL #1**

"Natural Source
Of Antioxidants"



1

**LABEL #2**



"Natural Source of Antioxidants"

"A natural source of protective antioxidants and blended using only 100% natural iients, Twinings Green Tea provides a great tasting and healthy tea experience."

**BLACK AND WHITE TEA**

8.    Statements similar to those appearing on the packages of all of the Twinings green

tea products also appear on each of the other Misbranded Food Products manufactured and sold

by the Defendant, including all of its black and white tea products including the following:

**Twinings Black Tea**

Lady Grey
English Breakfast
Prince of Wales
Variety Pack black Teas
Darjeeling
Ceylon Orange Pekoe
Blackcurrant Breeze Orange Bliss
Pomegranate Delight
Breakfast Blend 100% Organic & Fair Trade Certified
Christmas Tea
Earl Grey
English Afternoon
Irish Breakfast
Lapsong Souchong
China Oolong
Mixed Berry
Lemon Twist Pure Mint
Earl Grey Organic & Fair Trade Certified
Black Tea with Lemon 100% Organic & Fair Trade Certified

Chai
Almond Chai
Hazelnut Chai
Ultra Spice Chai
Spiced Apple Chai
French Vanilla Chai
Pumpkin Spice Chai
Decaf Chai
Lady Grey Decaf Tea
Earl Grey Decaf Tea
Irish Breakfast Decaf Tea
English Breakfast Decaf Tea
English Classic Cold Brewed Iced Tea
Citrus Twist Cold Brewed Iced Tea
English Classic Cold Brewed Iced Tea
Lady Grey Cold Brewed Iced Tea
Mixed Berries Cold Brewed Iced Tea

**Twinings White Tea**

Pure White Tea

9.      These claims violate the same statutory provisions as the claims on the green tea and are factually indistinguishable from those claims. Each of Defendant's black and white tea products, including Twinings' (i) Earl Grey Black Tea, (ii) Black Tea with Lemon Organic and Fair Trade Certified, and (iii) Lemon Twist (black tea) purchased by the Plaintiff has the same unlawful *"Tea is a Natural Source of Antioxidants"* seal on the label. Such claims have been repeatedly targeted by the FDA as unlawful for tea and other food products. As will be fully shown in this Third Amended Complaint claims that Twinings' teas "contain" or "provide" or are a "natural source" of antioxidants are false and unlawful. Defendant's teas do not meet the minimum nutrient level threshold to make such a claim which is 10% or more of the RDI or the DRV of a nutrient with a recognized RDI per reference amount customarily consumed. Said seal which appears an all Twinings Black and White tea is shown below.



10.    For example, as shown below the Earl Grey Tea (black tea) product purchased by Plaintiff has the ubiquitous seal "*tea is a natural source of antioxidants*" as do all other black and white tea products.



"Tea is a Natural Source Of Antioxidants"

11.    During various times during the Class Period, Plaintiff read the antioxidant related nutrient content claims regarding the presence of beneficial antioxidants and the health claims appearing on Defendant's labels as specified above and on Twinings website and relied on this information in making her decisions to purchase Defendant's tea products. Plaintiff paid a premium for Defendant's products with the purported nutritional and health benefits. Had Plaintiff known the truth-- that the products did not in fact contain recognized and accepted nutritional and healthful value, Plaintiff would not have paid such a premium or would not have bought the products.

12.    If a manufacturer is going to make a claim on a food label, the label must meet certain legal requirements that help consumers make informed choices and ensure that they are not misled.  As described more fully below, Defendant has made, and continues to make, false and deceptive claims in violation of federal and California laws that govern the types of representations that can be made on food labels.  These laws recognize that reasonable consumers

1   are likely to choose products claiming to have a health or nutritional benefit over otherwise

2   similar food products that do not claim such benefits.

3          13.     On its website, Twinings also promotes the health benefits of its tea

4   products, specifically focusing on antioxidants. It also claims that its green, black and

5   white teas are "rich" or "high" or "contain" antioxidants. The website contains the

6   following statements (emphasis added):

> DID YOU KNOW?
> **Tea is a healthy beverage. Rich in antioxidants**, refreshing and less than 1
> calorie per serving if you don't add sugar or milk.
>
> . . . .
>
> ANTIOXIDANTS
> You might not have heard of them, but flavonoid antioxidants are naturally
> present in lots of food, including fruit, vegetables and tea. Along with other
> antioxidants like vitamin C, vitamin A and chlorophyll, **flavonoid antioxidants
> can help to keep cells and tissues healthy.**
> They do this by mopping up free radicals—atoms or molecules with unpaired
> electrons. Free radicals are made by all living organisms, but they're also in things
> like pollution. While we all need free radicals, a build-up in our bodies can
> damage cells and DNA.
>
> Green teas aren't oxidised at all, which lets the tea leaves retain their green colour
> and keep their very delicate flavour. To prevent the freshly picked leaves from
> oxidising, green tea leaves are either pan fried or steamed to kill active enzymes
> in the leaf before rolling. **Green tea is naturally rich in antioxidants** that may
> help protect the body from damage caused by free radicals.
> . . . .
>
> What are antioxidants?
>
> See *Health Benefits*. **All tea has antioxidants (Black, Oolong, Green, and Rooibos Red
> Tea).** Levels of antioxidants will vary by tea type due to the product process. A growing
> body of research indicates that the tannins in tea are naturally-occurring flavonoids which
> have strong antioxidant properties. Drinking tea is a natural and pleasant way to increase
> dietary intake of antioxidants.
> ….
> Decaffeination Process: The Twinings Way
> **Decaffeinating does not affect the beneficial antioxidant properties of tea**.

http://www.twiningsusa.com.

          14.     Plaintiff reviewed the website at various times during the Class Period and read the

health claims and antioxidant related nutrient content claims appearing on Defendant's website as

specified above prior to purchasing said products and relied on this information in making her

decisions to purchase Defendant's tea products.

15.     In doing so, Twinings uses its website to make unlawful (i) antioxidant related nutrient content claims and (ii) health claims that have been expressly condemned by the Federal Food and Drug Administration ("FDA") in numerous enforcement actions and warning letters.

16.     These health claims and antioxidant related nutrient content claims on Twinings' website become part of the product labels because all Misbranded Food Products have Twinings' website on the label, www.twiningsusa.com, and refer consumers to the website for more information.

17.     Under federal and California law (21 U.S.C. § 321(m)) these claims/representations are incorporated into the labels as if the physical product label itself contained the language found on Defendant's website. The label reference to a website becoming part of the label was pointed out by FDA in warning letters to other tea companies, including Unilever for its Lipton Tea products as shown in Exhibit 2 attached hereto and made a part hereof by reference, in which FDA stated: "A link to your website… appears on … product label… We have determined that your websites… are labeling within the meaning of 201(m) of the act…." Therefore, all of Defendant's Misbranded Food Products are misbranded.

18.     During various times during the Class Period, Plaintiff read the health claims and nutrient content (antioxidant and other) claims appearing on Defendant's product labels as specified above including the claims that Twinings Tea was "*natural source of antioxidants*" and "*natural source of protective antioxidants*" prior to purchasing said products relied on this information in making her decisions to purchase Defendant's tea products. During various times during the Class Period and before purchasing Twinings' tea products, Plaintiff also read the health claims and nutrient content (antioxidant and other) claims appearing on Defendant's website as specified above including the claims that Defendants' tea was "*rich in antioxidants*", "*contains antioxidants*", "*natural source of antioxidants*" as well as the claims that "*Black and green teas also contain Vitamins A, B1, B2 and B6, along with calcium, zinc and folic acid. Tea is also a rich source of potassium—vital for maintaining a normal heartbeat and regulating fluid levels in cells and manganese, an essential mineral for bone growth*" and relied on this information in making her decisions to purchase Defendant's tea products. Plaintiff paid a

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 12-CV-02646 (RMW)

9

premium for Defendant's products with the purported health benefits. Had Plaintiff known the truth-- that the products did not in fact contain recognized and accepted nutritional and healthful value, Plaintiff would not have paid such a premium or would not have bought the products.

19.     Under California law, which is identical to federal law, a number of the Defendant's food labeling practices are unlawful because they are deceptive and misleading to consumers. These include:

a.     Making unlawful nutrient content claims on the labels of food products that fail to meet the minimum nutritional requirements legally required for the nutrient content claims being made;

b.     Making unlawful antioxidant claims on the labels of food products that fail to meet the minimum nutritional requirements legally required for the antioxidant claims being made;

c.     Making unlawful and unapproved health claims about their products that are prohibited by law; and

d.     Making unlawful claims that suggest to consumers that their products can prevent the risk or treat the effects of certain diseases like cancer or heart disease.

20.     These practices are not only illegal but they mislead consumers and deprive them of the information they require to make informed purchasing decisions. Thus, for example, a mother who reads labels because she wants to purchase healthy foods for her family would be misled by Defendant's practices and labeling.

21.     California and federal laws have placed numerous requirements on food companies that are designed to ensure that the claims that companies make about their products to consumers are truthful, accurate and backed by acceptable forms of scientific proof. When a company such as Twinings makes unlawful antioxidant related nutrient content or health claims that are prohibited by regulation, consumers such as Plaintiff are misled.

22.     Identical federal and California laws regulate the content of labels on packaged food. The requirements of the federal Food Drug & Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA") were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law, California Health & Safety Code § 109875 *et seq.* (the "Sherman Law"). Under both the Sherman Law and FDCA section 403(a), food is "misbranded" if "its labeling is false or

1    misleading in any particular," or if it does not contain certain information on its label or in its

2    labeling.  21 U.S.C. § 343(a).

3         23.    Under the FDCA, the term "false" has its usual meaning of "untruthful," while the

4    term "misleading" is a term of art.  Misbranding reaches not only false claims, but also those

5    claims that might be technically true, but still misleading.  If any one representation in the

6    labeling is misleading, then the entire food is misbranded, and no other statement in the labeling

7    can cure a misleading statement.  "Misleading" is judged in reference to "the ignorant, the

8    unthinking and the credulous who, when making a purchase, do not stop to analyze."  *United*

9    *States v. El-O-Pathic Pharmacy*, 192 F.2d 62, 75 (9th Cir. 1951).  Under the FDCA, it is not

10   necessary to prove that anyone was actually misled.

11        24.    On August 23, 2010, the FDA sent a warning letter to Unilever, the parent

12   company of Lipton Tea, one of Twinings' biggest competitors, informing Unilever of Lipton

13   Tea's failure to comply with the FDCA and its regulations (the "FDA Warning Letter," is

14   attached hereto as Exhibit 2) for remarkably similar nutrient content claims to those Twinings is

15   presently making on its product labels.  The FDA Warning Letter to Unilever stated, in pertinent

16   part:

17        **Unauthorized Nutrient Content Claims**

18        Under section 403(r)(1)(A) of the Act [21 U.S.C. 343(r)(1)(A)], a claim that
          characterizes the level of a nutrient which is of the type required to be in the
19        labeling of the food must be made in accordance with a regulation promulgated by
          the Secretary (and, by delegation, FDA) authorizing the use of such a claim. The
20        use of a term, not defined by regulation, in food labeling to characterize the level
          of a nutrient misbrands a product under section 403(r)(1)(A) of the Act.
21
          Nutrient content claims using the term "antioxidant" must also comply with the
22        requirements listed in 21 CFR 101.54(g). These requirements state, in part, that for
          a product to bear such a claim, an RDI must have been established for each of the
23        nutrients that are the subject of the claim (21 CFR 101.54(g)(1)), and these
          nutrients must have recognized antioxidant activity (21 CFR 101.54(g)(2). The
24        level of each nutrient that is the subject of the claim must also be sufficient to
          qualify for the claim under 21 CFR 101.54(b), (c), or (e) (21 CFR 101.54(g)(3)).
25        For example, to bear the claim "high in antioxidant vitamin C," the product must
          contain 20 percent or more of the RDI for vitamin C under 21 CFR 101.54(b).
26        Such a claim must also include the names of the nutrients that are the subject of
          the claim as part of the claim or, alternatively, the term "antioxidant" or
27        "antioxidants" may be linked by a symbol (e.g., an asterisk) that refers to the same
          symbol that appears elsewhere on the same panel of the product label, followed by
28        the name or names of the nutrients with recognized antioxidant activity (21 CFR

101.54(g)(4)). The use of a nutrient content claim that uses the term "antioxidant" but does not comply with the requirements of 21 CFR 101.54(g) misbrands a product under section 403(r)(2)(A)(i) of the Act.

Your webpage entitled "Tea and Health" and subtitled "Tea Antioxidants" includes the statement, "LIPTON Tea is made from tea leaves rich in naturally protective antioxidants." The term "rich in" is defined in 21 CFR 101.54(b) and may be used to characterize the level of antioxidant nutrients (21 CFR 101.54(g)(3)). However, this claim does not comply with 21 CFR 101.54(g)(4) because it does not include the nutrients that are the subject of the claim or use a symbol to link the term "antioxidant" to those nutrients. Thus, this claim misbrands your product under section 403(r)(2)(A)(i) of the Act.

This webpage also states: "[t]ea is a naturally rich source of antioxidants." The term "rich source" characterizes the level of antioxidant nutrients in the product and, therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "rich source" could be considered a synonym for a term defined by regulation (e.g., "high" or "good source"), nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). The claim "tea is a naturally rich source of antioxidants" does not include the nutrients that are the subject of the claim or use a symbol to link the term "antioxidant" to those nutrients, as required by 21 CFR 101.54(g)(4). Thus, this claim misbrands your product under section 403(r)(2)(A)(i) of the Act.

The product label back panel includes the statement "packed with protective FLAVONOID ANTIOXIDANTS." The term "packed with" characterizes the level of flavonoid antioxidants in the product; therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "packed with" could be considered a synonym for a term defined by regulation, nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). The claim "packed with FLAVONOID ANTIOXIDANTS" does not comply with 21 CFR 101.54(g)1 because no RDI has been established for flavonoids. Thus, this unauthorized nutrient content claim causes your product to be misbranded under section 403(r)(2)(A)(i) of the Act.

The above violations are not meant to be an all-inclusive list of deficiencies in your products or their labeling. It is your responsibility to ensure that all of your products are in compliance with the laws and regulations enforced by FDA. You should take prompt action to correct the violations. Failure to promptly correct these violations may result in regulatory actions without further notice, such as seizure and/or injunction.

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm224509.htm.

As shown above, the label on Twinings green tea products contains the unlawful statement "*Natural Source of Antioxidants*."  The label also touts the "*Natural Source of Protective Antioxidants*".  The label also touts claimed health benefits from drinking these tea products, "*healthy tea experience*". Similarly, the labels of Twinings black and white tea products

contain the unlawful statement "*tea is a natural source of antioxidants*". As made clear by governing regulations such as 21 C.F.R. §§ 101.13, 101.54 and 101.65 such claims are unlawful and as determined by the FDA in the Unilever/Lipton warning letter, such nutrient content and health claims are in violation of such regulations and 21 U.S.C. § 352(f)(1), and therefore the products are misbranded.

25.     Defendant has made, and continues to make, food label claims that are prohibited by California and federal law.  Under California and federal law, Defendant's Misbranded Food Products cannot legally be manufactured, advertised, distributed, held or sold.  Defendant's false and misleading labeling practices stem from its global marketing strategy.  Thus, the violations and misrepresentations are similar across product labels and product lines. Defendant's violations of law are numerous and include: (1) the illegal advertising, marketing, distribution, delivery and sale of Defendant's Misbranded Food Products to consumers and (2) the utilization of unlawful nutrient content claims (antioxidant and otherwise) and health claims on its product labels and website.

## **PARTIES**

26.     Plaintiff Nancy Lanovaz is a resident of Los Gatos, California who purchased Misbranded Food Products in California since May 2, 2008, four (4) years prior to the filing of the original complaint.

27.     Defendant, Twinings of North America, Inc. is a Delaware corporation with its principle place of business in Clifton, New Jersey. Twinings is one of the largest tea producers in the country with sale in the hundreds of millions of dollars over the Class Period.

28.     Twinings is a leading producer of retail specialty tea products including green, black and white and products. Twinings sells its Misbranded Food Products to consumers through grocery stores, other retail stores and on its website throughout the United States and California.

## **JURISDICTION AND VENUE**

29.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which:  (1) there are over 100 members in the proposed class; (2) members of the proposed class have a different citizenship from Defendant; and (3) the claims

of the proposed class members exceed $5,000,000 in the aggregate whether the class is limited to products purchased by Plaintiff or is extended to other Twinings tea products with similar, if not identical, unlawful claims on the packages and on Twinings' website.

30.     Alternatively, the Court has jurisdiction over all claims alleged herein pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, and is between citizens of different states.

31.     The Court has personal jurisdiction over Defendant because a substantial portion of the wrongdoing alleged in this Third Amended Complaint occurred in California, Defendant is authorized to do business in California, has sufficient minimum contacts with California, and otherwise intentionally avails itself of the markets in California through the promotion, marketing and sale of merchandise, sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

32.     Because a substantial part of the events or omissions giving rise to these claims occurred in this District and because the Court has personal jurisdiction over Defendant, venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (b).

## FACTUAL ALLEGATIONS

### A.     Identical California and Federal Laws Regulate Food Labeling

33.     Food manufacturers are required to comply with federal and state laws and regulations that govern the labeling of food products.  First and foremost among these is the FDCA and its labeling regulations, including those set forth in 21 C.F.R. § 101.

34.     Pursuant to the Sherman Law, California has expressly adopted the federal labeling requirements as its own and indicated that "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food regulations of this state."  California Health & Safety Code § 110100.

35.     Pursuant to the Sherman Law, California has expressly adopted the federal labeling requirements as its own and indicated that "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993,

1    or adopted on or after that date shall be the food regulations of this state." California Health &

2    Safety Code § 110100.

3         36.     In addition to its blanket adoption of federal labeling requirements, California has

4    also enacted a number of laws and regulations that adopt and incorporate specific enumerated

5    federal food laws and regulations.  For example, food products are misbranded under California

6    Health & Safety Code § 110660 if their labeling is false and misleading in one or more

7    particulars; are misbranded under California Health & Safety Code § 110665 if their labeling fails

8    to conform to the requirements for nutrient labeling set forth in 21 U.S.C. § 343(q) and

9    regulations adopted thereto; are misbranded under California Health & Safety Code § 110670 if

10   their labeling fails to conform with the requirements for nutrient content and health claims set

11   forth in 21 U.S.C. § 343(r) and regulations adopted thereto; are misbranded under California

12   Health & Safety Code § 110705 if words, statements and other information required by the

13   Sherman Law to appear on their labeling are either missing or not sufficiently conspicuous; are

14   misbranded under California Health & Safety Code § 110735 if they are represented as having

15   special dietary uses but fail to bear labeling that adequately informs consumers of their value for

16   that use; and are misbranded under California Health & Safety Code § 110740 if they contain

17   artificial flavoring, artificial coloring and chemical preservatives but fail to adequately disclose

18   that fact on their labeling.

19              **B.      FDA Enforcement History**

20        37.     In recent years the FDA has become increasingly concerned that food

21   manufacturers were disregarding food labeling regulations. To address this concern, the FDA

22   elected to take steps to inform the food industry of its concerns and to place the industry on notice

23   that food labeling compliance was an area of enforcement priority.

24        38.     In October 2009, the FDA issued a *Guidance For Industry: Letter Regarding*

25   *Point Of Purchase Food Labeling* to address its concerns about front of package labels ("2009

26   FOP Guidance").  The 2009 FOP Guidance advised the food industry:

27        FDA's research has found that with FOP labeling, people are less likely to check
          the Nutrition Facts label on the information panel of foods (usually, the back or
28        side of the package). It is thus essential that both the criteria and symbols used in

front-of-package and shelf-labeling systems be nutritionally sound, well-designed to help consumers make informed and healthy food choices, and not be false or misleading. The agency is currently analyzing FOP labels that appear to be misleading. The agency is also looking for symbols that either expressly or by implication are nutrient content claims. We are assessing the criteria established by food manufacturers for such symbols and comparing them to our regulatory criteria.

It is important to note that nutrition-related FOP and shelf labeling, while currently voluntary, is subject to the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations. Therefore, FOP and shelf labeling that is used in a manner that is false or misleading misbrands the products it accompanies. Similarly, a food that bears FOP or shelf labeling with a nutrient content claim that does not comply with the regulatory criteria for the claim as defined in Title 21 Code of Federal Regulations (CFR) 101.13 and Subpart D of Part 101 is misbranded. We will consider enforcement actions against clear violations of these established labeling requirements. . .

… Accurate food labeling information can assist consumers in making healthy nutritional choices. FDA intends to monitor and evaluate the various FOP labeling systems and their effect on consumers' food choices and perceptions. FDA recommends that manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA laws and regulations. FDA will proceed with enforcement action against products that bear FOP labeling that are explicit or implied nutrient content claims and that are not consistent with current nutrient content claim requirements. FDA will also proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading.

39.     The 2009 FOP Guidance recommended that "manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA law and regulations" and specifically advised the food industry that it would "proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading."

40.     Despite the issuance of the 2009 FOP Guidance, Defendant did not remove the unlawful and misleading food labeling claims from its Misbranded Food Products.

41.     On March 3, 2010, the FDA issued an "Open Letter to Industry from [FDA Commissioner] Dr. Hamburg" (hereinafter, "Open Letter"). The Open Letter reiterated the FDA's concern regarding false and misleading labeling by food manufacturers. In pertinent part the letter stated:

In the early 1990s, the Food and Drug Administration (FDA) and the food industry worked together to create a uniform national system of nutrition labeling, which

includes the now-iconic Nutrition Facts panel on most food packages.  Our citizens appreciate that effort, and many use this nutrition information to make food choices.  Today, ready access to reliable information about the calorie and nutrient content of food is even more important, given the prevalence of obesity and diet-related diseases in the United States.  This need is highlighted by the announcement recently by the First Lady of a coordinated national campaign to reduce the incidence of obesity among our citizens, particularly our children.

With that in mind, I have made improving the scientific accuracy and usefulness of food labeling one of my priorities as Commissioner of Food and Drugs.  The latest focus in this area, of course, is on information provided on the principal display panel of food packages and commonly referred to as "front-of-pack" labeling. The use of front-of-pack nutrition symbols and other claims has grown tremendously in recent years, and it is clear to me as a working mother that such information can be helpful to busy shoppers who are often pressed for time in making their food selections. …

As we move forward in those areas, I must note, however, that there is one area in which more progress is needed.  As you will recall, we recently expressed concern, in a "Dear Industry" letter, about the number and variety of label claims that may not help consumers distinguish healthy food choices from less healthy ones and, indeed, may be false or misleading.

At that time, we urged food manufacturers to examine their product labels in the context of the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations.  As a result, some manufacturers have revised their labels to bring them into line with the goals of the Nutrition Labeling and Education Act of 1990.  Unfortunately, however, we continue to see products marketed with labeling that violates established labeling standards.

To address these concerns, FDA is notifying a number of manufacturers that their labels are in violation of the law and subject to legal proceedings to remove misbranded products from the marketplace.  While the warning letters that convey our regulatory intentions do not attempt to cover all products with violative labels, they do cover a range of concerns about how false or misleading labels can undermine the intention of Congress to provide consumers with labeling information that enables consumers to make informed and healthy food choices
.  .  .  .
These examples and others that are cited in our warning letters are not indicative of the labeling practices of the food industry as a whole.  In my conversations with industry leaders, I sense a strong desire within the industry for a level playing field and a commitment to producing safe, healthy products.  That reinforces my belief that FDA should provide as clear and consistent guidance as possible about food labeling claims and nutrition information in general, and specifically about how the growing use of front-of-pack calorie and nutrient information can best help consumers construct healthy diets.

I will close with the hope that these warning letters will give food manufacturers further clarification about what is expected of them as they review their current labeling.  I am confident that our past cooperative efforts on nutrition information and claims in food labeling will continue as we jointly develop a practical, science-based front-of-pack regime that we can all use to help consumers choose healthier foods and healthier diets.

42.     Notwithstanding the Open Letter, Defendant continued to utilize unlawful food labeling claims despite the express guidance of the FDA in the Open Letter.

43.     In addition to its guidance to industry, the FDA has sent warning letters to industry, including many of Defendant's peer/competitor food manufacturers for the same types of unlawful nutrient content claims described above.

44.     In these letters dealing with unlawful nutrient content claims, the FDA indicated that, as a result of the same type of claims utilized by the Defendant, products were in "violation of the Federal Food, Drug, and Cosmetic Act … and the applicable regulations in Title 21, Code of Federal Regulations, Part 101 (21 CFR § 101)" and "misbranded within the meaning of section 403(r)(1)(A) because the product label bears a nutrient content claim but does not meet the requirements to make the claim."   These warning letters were not isolated as the FDA has issued numerous warning letters to other companies for the same type of food labeling claims at issue in this case; the same being released as public records discoverable and downloadable from the internet.

45.     The FDA stated that the agency not only expected companies that received warning letters to correct their labeling practices but also anticipated that other firms would examine their food labels to ensure that they are in full compliance with food labeling requirements and make changes where necessary. Defendant did not change the labels on its Misbranded Food Products in response to the warning letters sent to other companies of which Defendant was aware.

46.     Defendant also continued to ignore the FDA's Guidance for Industry, A Food Labeling Guide which details the FDA's guidance on how to make food labeling claims. Defendant continues to utilize unlawful claims on the labels of its Misbranded Food Products. As such, Defendant's Misbranded Food Products continue to run afoul of FDA guidance as well as California and federal law.

47.     Despite the FDA's numerous warnings to industry of which Defendant was aware, Defendant has continued to sell products bearing unlawful food labeling claims without meeting the requirements to make them.

48.     Plaintiff did not know, and had no reason to know, that the Defendant's Misbranded Food Products were misbranded and bore food labeling claims despite failing to meet the requirements to make those food labeling claims.  Similarly, Plaintiff did not, and had no reason to know, that Twinings' Misbranded Food Products she purchased were misbranded because their labeling was false and misleading.

### C.     Defendant's Food Products Are Misbranded

49.     Pursuant to Section 403 of the FDCA, a claim that characterizes the level of a nutrient in a food is a "nutrient content claim" that must be made in accordance with the regulations that authorize the use of such claims.  21 U.S.C. § 343(r)(1)(A).  California expressly adopted the requirements of 21 U.S.C. § 343(r) in § 110670 of the Sherman Law.

50.     Nutrient content claims are claims about specific nutrients contained in a product. They are typically made on the front or top of packaging in a font large enough to be read by the average consumer.  Because these claims are relied upon by consumers when making purchasing decisions, the regulations govern what claims can be made in order to prevent misleading claims.

51.     Section 403(r)(1)(A) of the FDCA governs the use of expressed and implied nutrient content claims on labels of food products that are intended for sale for human consumption.  *See* 21 C.F.R. § 101.13.

52.     21 C.F.R. § 101.13 provides the general requirements for nutrient content claims, which California has expressly adopted.  *See* California Health & Safety Code § 110100.  21 C.F.R. § 101.13 requires that manufacturers include certain disclosures when a nutrient claim is made and, at the same time, the product contains certain levels of unhealthy ingredients, such as fat and sodium.  It also sets forth the manner in which that disclosure must be made, as follows:

> (4)(i) The disclosure statement "See nutrition information for ___ content" shall be in easily legible boldface print or type, in distinct contrast to other printed or graphic matter, and in a size no less than that required by §101.105(i) for the net quantity of contents statement, except where the size of the claim is less than two times the required size of the net quantity of contents statement, in which case the disclosure statement shall be no less than one-half the size of the claim but no smaller than one-sixteenth of an inch, unless the package complies with §101.2(c)(2), in which case the disclosure statement may be in type of not less than one thirty-second of an inch.
>
> (ii) The disclosure statement shall be immediately adjacent to the nutrient content

claim and may have no intervening material other than, if applicable, other information in the statement of identity or any other information that is required to be present with the claim under this section (e.g., see paragraph (j)(2) of this section) or under a regulation in subpart D of this part (e.g., see §§101.54 and 101.62). If the nutrient content claim appears on more than one panel of the label, the disclosure statement shall be adjacent to the claim on each panel except for the panel that bears the nutrition information where it may be omitted.

53.    An "expressed nutrient content claim" is defined as any direct statement about the level (or range) of a nutrient in the food (*e.g.*, "low sodium" or "contains 100 calories"). *See* 21 C.F.R. § 101.13(b)(1).

54.    An "implied nutrient content claim" is defined as any claim that: (i) describes the food or an ingredient therein in a manner that suggests that a nutrient is absent or present in a certain amount (*e.g.*, "high in oat bran"); or (ii) suggests that the food, because of its nutrient content, may be useful in maintaining healthy dietary practices and is made in association with an explicit claim or statement about a nutrient (*e.g.*, "healthy, contains 3 grams (g) of fat"). 21 C.F.R. § 101.13(b)(2)(i-ii).

55.    These regulations authorize use of a limited number of defined nutrient content claims. In addition to authorizing the use of only a limited set of defined nutrient content terms on food labels, these regulations authorize the use of only certain synonyms for these defined terms. If a nutrient content claim or its synonym is not included in the food labeling regulations it cannot be used on a label. Only those claims, or their synonyms, that are specifically defined in the regulations may be used. All other claims are prohibited. 21 CFR § 101.13(b).

56.    Only approved nutrient content claims will be permitted on the food label, and all other nutrient content claims will misbrand a food. It is thus clear which types of claims are prohibited and which types are permitted. Manufacturers are on notice that the use of an unapproved nutrient content claim is prohibited conduct. 58 Fed. Reg. 2302. In addition, 21 U.S.C. § 343(r)(2), whose requirements have been adopted by California, prohibits using unauthorized undefined terms and declares foods that do so to be misbranded.

57.    Similarly, the regulations specify absolute and comparative levels at which foods qualify to make these claims for particular nutrients (e.g., low fat . . . more vitamin C) and list synonyms that may be used in lieu of the defined terms. Certain implied nutrient content claims

(e.g., "healthy") also are defined. The daily values (DVs) for nutrients that the FDA has established for nutrition labeling purposes have application for nutrient content claims, as well. Claims are defined under current regulations for use with nutrients having established DVs; moreover, relative claims are defined in terms of a difference in the percent DV of a nutrient provided by one food as compared to another. *See e.g.*, 21 C.F.R. §§ 101.13 and 101.54.

1.    **Defendant Has Made Unlawful and Misleading Nutrient Content Claims (Antioxidant, Vitamin and Other) That Violate The General Nutrient Content Labeling Rules**

58.    Defendant's nutrient contents claims on its product labels and its website (and therefore its label) that its green, black and white teas are "*natural source of antioxidants*" or "*natural source of protective antioxidants*" or "*rich in antioxidants*", or "*ideal source of antioxidants*" or *"contain antioxidants"* are unlawful and misleading. Moreover, Defendant's claims that "*Black and green teas also contain Vitamins A, B1, B2 and B6, along with calcium, zinc and folic acid. Tea is also a rich source of potassium—vital for maintaining a normal heartbeat and regulating fluid levels in cells and manganese, an essential mineral for bone growth*" is unlawful, false and misleading because none of these vitamins or minerals are present in a sufficient quantity to support such a claim.

59.    In order to appeal to consumer preferences, Defendant has repeatedly made unlawful nutrient content claims about antioxidants and other nutrients that fail to utilize one of the limited defined terms. These nutrient content claims are unlawful because they failed to comply with the nutrient content claim provisions in violation of 21 C.F.R. §§ 101.13, 101.54 and 101.65, which have been incorporated in California's Sherman Law.  To the extent that the terms used to describe antioxidants without a recognized daily value or RDI (such as "natural source") are deemed to be a synonym for a defined term like "contain" the claim would still be unlawful because, as these nutrients do not have established daily values, they cannot serve as the basis for a term that has a minimum daily value threshold as the defined terms at issue here do. To the extent that the claims refer to Vitamins A, B1, B2, and B6; or to calcium, zinc, folic acid and potassium, none of these are present in sufficient quantities (if at all) to comply with the nutrient content provisions.

60.     Defendant's claims concerning unnamed antioxidant nutrients or the other vitamins or nutrients are false because Defendant's use of a defined term is in effect a claim that the products have met the minimum nutritional requirements for the use of the defined term when they have not.  For example, antioxidant related nutrient content claims that Defendant make on the labels of its green, black and white and on its website about its teas are false and unlawful because they use defined terms such as "*rich in,*" "*protective*", "*ideal*" and "*contains*."  Defendant uses these terms to describe antioxidants and flavonoids in its teas that fail to satisfy the minimum nutritional thresholds for these defined terms.

61.     An "excellent source" claim requires a nutrient to be present at a level at least 20% of the Daily Value for that nutrient while "contains" and "provides" claims require a nutrient to be present at a level at least 10% of the Daily Value for that nutrient.  Defendants' "*rich in antioxidants*" or *"ideal source of antioxidants"* claims require 20% DV.  Defendant's "*contains*", "natural source" and "provides" claims about its teas are nutrient content claims require a minimum 10% DV.

62.     Therefore, the claims that Twinings' teas are "*rich in antioxidants*" or *"ideal source of antioxidants* are false and unlawful. Defendant's teas do not meet the minimum nutrient level threshold to make such a claim, which is 20% or more of the RDI or the DRV of a nutrient with an established RDI per reference amount customarily consumed. Similarly, claims that Twinings' teas "contain" or "provide" or are a "natural source" of antioxidants are false and unlawful. Defendant's teas do not meet the minimum nutrient level threshold to make such a claim which is 10% or more of the RDI or the DRV of a nutrient with a recognized RDI per reference amount customarily consumed.

63.     Defendant's misuse of defined terms is not limited the antioxidant related nutrient content claims on one or two products. Defendant's tea related claims are part of a widespread practice of misusing defined nutrient content claims to overstate the nutrient content of all of its tea products.  The statements regarding antioxidants and the health benefits to be derived from consuming defendant's products appear on each variety of Defendant's green, black and white tea products. These other products are substantially similar to the tea products purchased by Plaintiff

in that they are all the same product (tea), derived from the same plant, packaged the same and bear the same or similar nutrient content claims on the product packages.

64.     By using a defined term like "good source" or an undefined term such as "natural source of," Defendant is, in effect, falsely asserting that its products meet at least the lowest minimum threshold for any nutrient content claim which would be 10% of the daily value of the nutrient at issue.  Such a threshold represents the lowest level that a nutrient can be present in a food before it becomes deceptive and misleading to highlight its presence in a nutrient content claim. Thus, for example, it is deceptive and misleading for Defendant to claim that its teas are a "good source" or "natural source" of antioxidants.  Tea does not contain an antioxidant with a recognized RDI, much less at a level as required by the regulations. None of the nutrients in tea has a DV and thus it is unlawful to make nutrient content claims about them.

65.     With regard to the claims that Twinings' green and black teas *"contain Vitamins A, B1, B2 and B6, along with calcium, zinc and folic acid"* and *"a rich source of potassium ... and manganese"* it is deceptive and misleading to make such claims because Twinings' tea products do not contain any of these nutrients in a significant amount (10% or 20% DV). The FDA has repeatedly condemned any reference to such nutrients on product labels where the product did not contain at least the lowest minimum threshold for any nutrient content claim which would be 10% of the daily value of the nutrient at issue.

66.     FDA enforcement actions targeting identical or similar claims to those made by Defendant have made clear the unlawfulness of such claims.  Defendant knew or should have known about these enforcement actions. For example, on March 24, 2011, the FDA sent Jonathan Sprouts, Inc. a warning letter where it specifically targeted a "source" type claim like the one used by Defendant. In that letter the FDA stated:

> Your Organic Clover Sprouts product label bears the claim "Phytoestrogen Source[.]" Your webpage entitled "Sprouts, The Miracle Food! - Rich in Vitamins, Minerals and Phytochemicals" bears the claim "Alfalfa sprouts are one of our finest food sources of . . . saponin." These claims are nutrient content claims subject to section 403(r)(1)(A) of the Act because they characterize the level of nutrients of a type required to be in nutrition labeling (phytoestrogen and saponin) in your products by use of the term "source." Under section 403(r)(2)(A) of the Act, nutrient content claims may be made only if the characterization of the level made in the claim uses terms which are defined by regulation. However, FDA has

1    not defined the characterization "source" by regulation. Therefore, this
     characterization may not be used in nutrient content claims.

2
     67.     It is thus clear that a "source" claim like the one utilized by Defendant is unlawful

3
     because the "FDA has not defined the characterization 'source' by regulation" and thus such a

4
     "characterization may not be used in nutrient content claims." Similarly, claims that Twinings

5
     teas are a "natural source" of antioxidants violate the express provisions of 21 C.F.R. § 101.54

6
     because the teas fail to satisfy the minimum 10% DV threshold.

7
     68.     Another example of FDA enforcement action for unlawful claims on product

8
     labels of the presence of antioxidant and other nutrients is the October 23, 2012 FDA warning

9
     letter to Hail Merry, LLC regarding claims on product labels and its website that its chocolate,

10
     almond and coconut products contained various nutrients, including antioxidants, vitamins,

11
     manganese, potassium and magnesium when, in fact the products did not contain these nutrients

12
     in a sufficient threshold amount to make the claim (10%  or 20% DV). In finding the products

13
     misbranded FDA stated:

14
15           ….Your Grawnola Orange Cranberry, Merry's Miracle Tart Chocolate,
             Almonds Vanilla Maple, and Sunflower Seeds Salt n Black Pepper products
16           are misbranded within the meaning of section 403(r)(1)(A) of the Act, 21
             U.S.C. §343(r)(1)(A), because the labels bear nutrient content claims, but
17           the products do not meet the requirements to bear the claims. Under section
             403(r)(1)(A) of the Act, a claim that characterizes the level of a nutrient
18           which is of the type required to be in the labeling of the food must be made
             in accordance with a regulation authorizing the use of such a claim.
19           Characterizing the level of a nutrient in food labeling without complying
             with the specific requirements pertaining to nutrient content claims for that
20           nutrient misbrands the product under section 403(r)(1)(A) of the Act. For
             example:

21           Your Grawnola Orange Cranberry product label bears the nutrient content
22           claim "Cranberries are loaded with antioxidants." Nutrient content claims
             using the term "antioxidant" must comply with, among other requirements,
23           the requirements listed in 21 CFR 101.54(g). These requirements state, in
             part, that for a product to bear such a claim, a reference daily intake (RDI)
24           must have been established for each of the nutrients that are the subject of
             the claim [21 CFR 101.54(g)(1)], and these nutrients must have recognized
25           antioxidant activity [21 CFR 101.54(g)(2)]. The level of each nutrient that is
             the subject of the claim must also be sufficient to qualify for the claim under
26           21 CFR 101.54(b), (c), or (e) [21 CFR 101.54(g)(3)]. For example, to bear
             the claim "high in antioxidant vitamin C," the product must contain 20
27           percent or more of the RDI for vitamin C under 21 CFR 101.54(b). Such a
28           claim must also include the names of the nutrients that are the subject of the

THIRD AMENDED CLASS ACTION COMPLAINT                                                              24
CASE NO. 12-CV-02646 (RMW)

claim as part of the claim or, alternatively, the term "antioxidant" or "antioxidants" may be linked by a symbol (e.g., an asterisk) that refers to the same symbol that appears elsewhere on the same panel of the product label, followed by the name or names of the nutrients with recognized antioxidant activity [21 CFR 101.54(g)(4)]. The antioxidant claim found on your product labels is a nutrient content claim because it characterizes the level of antioxidants in your products, but it does not comply with 21 CFR 101.54(g)(4) because the claim does not include the names of the nutrients that are the subject of the claim or link the nutrients with the claim by use of a symbol.

Your Sunflower Seeds Salt n Black pepper product label contains the nutrient content claim "[R]ich source [of] ... iron ." A product that claims to be "rich" in a nutrient must contain at least 20 percent of the RDI per RACC for the nutrient as required by 21 CFR 101 .54(b). Based upon your nutrition information, a 28 g serving contains 10 percent of the RDI for iron. This equates to approximately 11% of RDI per RACC. Therefore, your product does not meet the requirements to bear a "rich" claim for iron. In addition, your Sunflower Seeds Salt n Black pepper product label contains the nutrient content claim "[R]ich source [of] . . . B vitamins, vitamin E as well as minerals copper, manganese, potassium, and magnesium, however the nutrient levels are not declared for these vitamins and minerals as required under 21 CFR 101.9(c)(8)(ii) and 101.13(n). Therefore the product is misbranded under section 403(q) and 403(r)(1)(A) of the Act. Further, because these nutrient levels are not declared, it is not clear whether the product has the required minimum 20 percent of the RDI per RACC of these nutrients as required under 21 CFR 101.54(b).

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2012/ucm326550.htm

69.    The types of misrepresentations made above would be considered by a reasonable consumer like the Plaintiff when deciding to purchase the products. Plaintiff placed, and a reasonable consumer would place, great importance on the claimed presence of "rich in *antioxidants*" or that the green, black or white tea was a "*natural source of antioxidants*" in choosing Defendant's products over other tea products and alternative beverage products.

70.    The nutrient content claims regulations discussed above are intended to ensure that consumers are not misled as to the actual or relative levels of nutrients in food products.

71.    Defendant has violated these referenced regulations. Plaintiff relied on Twinings' nutrient content claims (antioxidant, vitamin, and mineral) when making her purchase decisions and was misled because she erroneously believed the implicit misrepresentation that the Twinings products she was purchasing were beneficial, healthy and met the minimum nutritional threshold to make such claims. Antioxidant and other claimed nutrient content was important to the

1    Plaintiff in trying to buy "healthy" food products. Plaintiff would not have purchased these

2    products had she known that the Twinings products did not have the beneficial effects claimed

3    and in fact did not satisfy such minimum nutritional requirements with regard to the claimed

4    nutrients.

5        72.    For these reasons, Defendant's nutrient content claims at issue in this Amended

6    Complaint are false and misleading and in violation of 21 C.F.R. §§ 101.13, 101.54 and 101.65

7    and identical California law, and the products at issue are misbranded as a matter of law.

8    Defendant has violated these referenced regulations. Therefore, Defendant's Misbranded Food

9    Products are misbranded as a matter of California and federal law and cannot be sold or held and

10   thus have no economic value and are legally worthless. Plaintiff and members of the Class who

11   purchased the Defendant's Misbranded Food Products paid an unwarranted premium for the

12   products.

13       73.    Plaintiff was thus misled by the Defendant's unlawful labeling practices and

14   actions into purchasing products she would not have otherwise purchased had she known the truth

15   about those products. Plaintiff had cheaper alternatives. Defendant's claims in this respect are

16   false and misleading and the products are in this respect misbranded under identical California

17   and federal laws.

18           **2.    Defendant Has Made Unlawful and Misleading Antioxidant
             Related Nutrient Content Claims That Violate The Specific**
19           **Antioxidant Labeling Rules**

20       74.    In addition to Defendant's violation of the general, basic provisions of the

21   Sherman Law as to making a nutrient content claim, Defendant also has violated identical

22   California and federal labeling regulations specific to antioxidants.

23       75.    Federal and California regulations regulate antioxidant claims as a particular type

24   of nutrient content claim.  Specifically, 21 C.F.R. § 101.54(g) contains special requirements for

25   nutrient claims that use the term "antioxidant":

26           (1)    the name of the antioxidant must be disclosed;

27           (2)    there must be an established Recommended Daily Intake ("RDI") for that

28                  antioxidant, and if not, no "antioxidant" claim can be made about it;

1    (3)  the label claim must include the specific name of the nutrient that is an

2        antioxidant and cannot simply say "antioxidants" (*e.g.*, "high in antioxidant

3        vitamins C and E"),[1] *see* 21 C.F.R. § 101.54(g)(4);

4    (4)  the nutrient that is the subject of the antioxidant claim must also have

5        recognized antioxidant activity, *i.e.*, there must be scientific evidence that

6        after it is eaten and absorbed from the gastrointestinal tract, the substance

7        participates in physiological, biochemical or cellular processes that

8        inactivate free radicals or prevent free radical-initiated chemical reactions,

9        *see* 21 C.F.R. § 101.54(g)(2);

10    (5)  the antioxidant nutrient must meet the requirements for nutrient content

11        claims in 21 C.F.R. § 101.54(b), (c), or (e) for "High" claims, "Good

12        Source" claims, and "More" claims, respectively. For example, to use a

13        "High" claim, the food would have to contain 20% or more of the Daily

14        Reference Value ("DRV") or RDI per serving. For a "Good Source"

15        claim, the food would have to contain between 10-19% of the DRV or RDI

16        per serving, *see* 21 C.F.R. § 101.54(g)(3); and

17    (6)  the antioxidant nutrient claim must also comply with general nutrient

18        content claim requirements such as those contained in 21 C.F.R. §

19        101.13(h) that prescribe the circumstances in which a nutrient content

20        claim can be made on the label of products high in fat, saturated fat,

21        cholesterol or sodium.

22   76.  The antioxidant labeling for Twinings' Misbranded Food Products and the claims

23 on Twinings' website promoting these products violate California law: (1) because the names of

24 the antioxidants are not disclosed on the product labels; (2) because there are no RDIs for the

---

[1] Alternatively, when used as part of a nutrient content claim, the term "antioxidant" or "antioxidants" (such as "high in antioxidants") may be linked by a symbol (such as an asterisk) that refers to the same symbol that appears elsewhere on the same panel of a product label followed by the name or names of the nutrients with the recognized antioxidant activity. If this is done, the list of nutrients must appear in letters of a type size height no smaller than the larger of one half of the type size of the largest nutrient content claim or 1/16 inch.

1  antioxidants being touted, including flavonoids and polyphenols; (3) because the claimed

2  antioxidant related nutrients fail to meet the requirements for nutrient content claims in 21 C.F.R.

3  § 101.54(b), (c), or (e) for "High" claims, "Good Source" claims, and "More" claims,

4  respectively; and (4) because Defendant lacks adequate scientific evidence that the claimed

5  antioxidant nutrients participate in physiological, biochemical, or cellular processes that

6  inactivate free radicals or prevent free radical-initiated chemical reactions after they are eaten and

7  absorbed from the gastrointestinal tract.

8       77.     For example, as discussed above, the package label of Twinings Green Tea

9  Jasmine bears the statement "*Natural source of Antioxidants.*"  The label further boasts, "*Natural*

10 *Source of Protective Antioxidants",* and "*Healthy Tea Experience".* Identical antioxidant related

11 nutrient content claims appea*r* on each and every Twinings green tea product as shown on Exhibit

12 1. Likewise the package label for all Twinings' black and white tea products bears a seal that

13 states: "*tea is a natural source of antioxidants.*" Additional antioxidant nutrient content claims

14 appear on Twinings' website sometimes referring to green tea, or black tea, or white tea and

15 sometimes to all teas. These same types of violations were condemned in the FDA Warning

16 Letter to Unilever/Lipton discussed above and attached as Exhibit 2.

17      78.     These same violations were condemned in numerous other warning letters to other

18 tea companies of which Defendant knew or should have known including the April 11, 2011

19 warning letter to Diaspora Tea & Herb Co., LLC (attached as Exhibit 3) which states in pertinent

20 part:

21          Additionally, your website bears nutrient content claims using the term
            "antioxidant." … Such a claim must also include the names of the nutrients that
22          are the subject of the claim as part of the claim or, alternatively, the term
            "antioxidant" or "antioxidants" may be linked by a symbol (e.g., an asterisk) that
23          refers to the same symbol that appears elsewhere on the same panel of the product
            label, followed by the name or names of the nutrients with recognized antioxidant
24          activity, 21 CFR 101.54(g)(4). The use of a nutrient content claim that uses the
            term "antioxidant" but does not comply with the requirements of 21 CFR
25          101.54(g) misbrands a product under section 403(r)(2)(A)(i) of the Act. The
            following are examples of nutrient content claims on your website that use the
26          term "antioxidant" but do not include the names of the nutrients that are the
            subject of the claim as required under 21 CFR 101.54(g)(4): "Yerba Maté is…rich
27          in… antioxidants."; …  "Caffeine-free Green Rooibos…contain[s] high
            concentrations of antioxidants….

28

Additionally, the following are examples of nutrient content claims on your website that use the term "antioxidant," but where the nutrients that are the subject of the claim do not have an established RDI as required under 21 CFR 101.54(g)(1): … "White Tea… contain[s] high concentrations of… antioxidant polyphenols (tea catechins)…." ; … "Antioxidant rich…222mg polyphenols per serving!"; … "Antioxidant rich…109mg polyphenols per serving!"

The above violations are not meant to be an all-inclusive list of deficiencies in your products and their labeling. It is your responsibility to ensure that products marketed by your firm comply with the Act and its implementing regulations. We urge you to review your website, product labels, and other labeling and promotional materials for your products to ensure that the claims you make for your products do not cause them to violate the Act. The Act authorizes the seizure of illegal products and injunctions against manufacturers and distributors of those products, 21 U.S.C. §§ 332 and 334.

79.     For these reasons, Defendant's antioxidant claims at issue in this Complaint are misleading and in violation of 21 C.F.R. § 101.54 and California law, and the products at issue are misbranded as a matter of law.  Misbranded products cannot be legally manufactured, advertised, distributed, held or sold and have no economic value and are legally worthless. Plaintiff and members of the Class who purchased these products paid an unwarranted premium for these products.

80.     In addition to the FDA Warning Letters to Unilever and Diaspora Tea & Herb Co., LLC discussed above (Exhibits 2 and 3), the FDA has issued numerous warning letters addressing similar unlawful antioxidant nutrient content claims. *See, e.g.*, FDA warning letter dated February 22, 2010 to Redco Foods, Inc. regarding its misbranded Salada Naturally Decaffeinated Green Tea product because "there are no RDIs for (the antioxidants) grapeskins, rooibos red tea) and anthocyanins"; FDA warning letter dated February 22, 2010 to Fleminger Inc. regarding its misbranded TeaForHealth products because the admonition "[d]rink high antioxidant green tea" . . . "does not include the nutrients that are the subject of the claim or use a symbol to link the term antioxidant to those nutrients".  These warning letters were hardly isolated. Defendant is aware of these FDA warning letters

81.     Additional evidence of Twinings' knowledge that its antioxidant and health claims are improper and misleading is provided by two findings of the British Advertising Standards Authority ("ASA"). The first is the September 26, 2007 Adjudication against an advertisement by the British Tea Counsel (a British Trade Association of tea producers of which Twinings is a

founding member) touting the presence of antioxidants in tea. ASA found the advertisement to be misleading stating in part (emphasis added):

> We considered, however, that readers were likely to infer from the ad that it had been proven that antioxidants, absorbed as a result of drinking four cups of tea per day, could help to protect the body against the damaging effects of free radical action.  We considered that we had not seen substantive evidence to demonstrate that the antioxidant potential realised from the consumption of four cups of tea per day could have any effect on free radical activity; **we concluded, therefore, that the claim "... We recommend 4 cups a day to contribute to a diet rich in antioxidants which could help to protect your body against the damaging effects of free radicals" was likely to mislead.**

> Adjudication of the ASA, United Kingdom Tea Counsil, September 26, 2007, http://www.asa.org.uk/Rulings/Adjudications/2007/9/United-Kingdom-Tea-Council/TF_ADJ_43234.aspx

82.     The Second is the November 25, 2009 ASA against one of Twinings' biggest competitors, Tetley Tea.  On information and belief Twinings was aware of this Adjudication against its competitor. There, the ASA found that Tetley's print and TV advertisements stating that Tetley's products were: "rich in antioxidants that can keep your heart healthy" were misleading. In so holding, ASA stated:

> Because the evidence we had seen was not directly relevant to the implied claim that green tea, or the antioxidants in it, had general health benefits, we considered it was not sufficient substantiation for that claim.  We concluded that the ad was misleading.

> On this point, the ad breached CAP (Broadcast) TV Advertising Standards Code rules 5.1.1 (Misleading advertising), 5.2.1 (Evidence), 5.2.2 (Implications), 8.3.1(a) (Accuracy in food advertising)

> The ad must not be broadcast again in its current form.  We told Tetley not to imply that a product had greater health benefits than it did if they did not hold substantiation for the implied claims….

> Adjudication of the ASA, Tetley GB Ltd., November 25, 2009, http://www.asa.org.uk/ASA-action/Adjudications/2009/11/Tetley-GB-Ltd/TF_ADJ_47670.aspx

83.     The types of misrepresentations made above would be considered by a reasonable consumer when deciding to purchase the products. Not only do Twinings' antioxidant, nutrient content and health claims regarding the benefits of "flavonoids" violate FDA rules and regulations, they directly contradict current scientific research, which has concluded: "[T]he evidence today does not support a direct relationship between tea consumption and a

physiological AOX [antioxidant] benefit." This conclusion was reported by Dr. Jane Rycroft, Director of Lipton Tea Institute of Tea, in an article published in January, 2011, in which Dr. Rycroft states:

> Only a few scientific publications report an effect of tea on free radical damage in humans using validated biomarkers in well designed human studies. Unfortunately, the results of these studies are at variance and the majority of the studies do not report significant effects . . .

> Therefore, despite more than 50 studies convincingly showing that flavonoids possess potent antioxidant activity *in vitro,* the ability of flavonoids to act as an antioxidant *in vivo* [in humans], has not been demonstrated.

> Based on the current scientific consensus that the evidence today does not support a direct relationship between tea consumption and a physiological AOX benefit…

> No evidence has been provided to establish that having antioxidant activity/content and/or antioxidant properties is a beneficial physiological effect.

> Rycroft, Jane, "The Antioxidant Hypothesis Needs to be Updated," Vol. 1, *Tea Quarterly Tea Science Overview,* Lipton Tea Institute of Tea Research (Jan. 2011), pp. 2-3.

84.     This scientific evidence and consensus conclusively establishes the improper nature of the Defendant's antioxidant claims as they cannot possibly satisfy the legal and regulatory requirement that the nutrient that is the subject of the antioxidant claim must also have recognized antioxidant activity, *i.e.*, there must be substantial scientific evidence that after it is eaten and absorbed from the gastrointestinal tract, the substance participates in physiological, biochemical or cellular processes that inactivate free radicals or prevent free radical-initiated chemical reactions, *see* 21 C.F.R. § 101.54(g)(2). In fact, the United States Department of Agriculture (USDA) recently removed its ORAC data base related to foods with antioxidant properties "because the values indicating antioxidant capacity have no relevance to the effects of specific bioactive compounds… on the human health" and that "ORAC values [the former USDA data base] are routinely misused by food and dietary supplement manufacturing companies to promote their products…." and "[t]here is no evidence that the beneficial effects of polyphenol-rich foods can be attributed to the antioxidant properties of these foods. " USDA Agricultural Research Service Oxygen Radical Absorbance Capacity (ORAC) of Selected Foods, Release 2 (2010). http://www.ars.usda.gov/Services/docs.htm?docid=15866

85.     The antioxidant regulations discussed above are intended to ensure that consumers are not misled as to the actual or relative levels of antioxidants in food products and purported beneficial health benefits from consuming the food product.

86.     Plaintiff relied on Defendant's nutrient content, antioxidant and health claims when making her purchase decisions over the last four years and was misled because she erroneously believed the implicit misrepresentation that the Defendant's products she was purchasing met the minimum nutritional threshold to make such claims. Antioxidant and flavonoid content was important to Plaintiff in trying to buy "healthy" food products. Plaintiff would not have purchased these products had she known that the Defendant's products did not in fact satisfy such minimum nutritional requirements with regard to antioxidants and the consumption of defendant's tea did not, in fact, result in the purported health benefits touted by Defendant.

87.     For these reasons, Defendant's antioxidant claims at issue in this Third Amended Complaint are false and misleading and in violation of 21 C.F.R. §§ 101.13, 101.54 and 101.65 and identical California law, and the products at issue are misbranded as a matter of law. Defendant has violated these referenced regulations. Therefore, Defendant's Misbranded Food Products are misbranded as a matter of California and federal law and cannot be sold or held and thus have no economic value and are legally worthless. Additionally, Plaintiff was misled and deceived by the actions of the Defendant in violation of California Law.

88.     Defendants' claims in this respect are false and misleading and the products are in this respect misbranded under identical California and federal laws, Misbranded products cannot be legally sold and have no economic value and are legally worthless. Plaintiff and members of the Class who purchased these products paid an unwarranted premium for these products.

### 3.     Defendant Has Made Unlawful and Misleading Health Claims

89.     Defendant violated identical California and federal law by making numerous unapproved health claims about its products. It has also violated identical California and federal law by making numerous unapproved claims about the ability of its products to cure, mitigate, treat and prevent various diseases that render its products unapproved drugs under California and

1   federal law. Moreover, in promoting the ability of its products to have an effect on certain

2   diseases such as cancer and heart disease among others, Defendant has violated the advertising

3   provisions of the Sherman law.

4          90.    A health claim is a statement expressly or implicitly linking the consumption of a

5   food substance (*e.g.*, ingredient, nutrient, or complete food) to risk of a disease (*e.g.*,

6   cardiovascular disease) or a health-related condition (*e.g.*, hypertension). *See* 21 C.F.R. §

7   101.14(a)(1), (a)(2), and (a)(5). Only health claims made in accordance with FDCA requirements,

8   or authorized by FDA as qualified health claims, may be included in food labeling. Other express

9   or implied statements that constitute health claims, but that do not meet statutory requirements,

10  are prohibited in labeling foods.

11         91.    21 C.F.R. § 101.14, which has been expressly adopted by California, provides

12  when and how a manufacturer may make a health claim about its product.  A "Health Claim"

13  means any claim made on the label or in labeling of a food, including a dietary supplement, that

14  expressly or by implication, including "third party" references, written statements (*e.g.*, a brand

15  name including a term such as "heart"), symbols (*e.g.*, a heart symbol), or vignettes, characterizes

16  the relationship of any substance to a disease or health-related condition. Implied health claims

17  include those statements, symbols, vignettes, or other forms of communication that suggest,

18  within the context in which they are presented, that a relationship exists between the presence or

19  level of a substance in the food and a disease or health-related condition (*see* 21 CFR §

20  101.14(a)(1)).

21         92.    Further, health claims are limited to claims about disease risk reduction, and

22  cannot be claims about the diagnosis, cure, mitigation, or treatment of disease. An example of an

23  authorized health claim is: "Three grams of soluble fiber from oatmeal daily in a diet low in

24  saturated fat and cholesterol may reduce the risk of heart disease. This cereal has 2 grams per

25  serving."

26         93.    A claim that a substance may be used in the diagnosis, cure, mitigation, treatment,

27  or prevention of a disease is a drug claim and may not be made for a food. 21 U.S.C. §

28  321(g)(1)(D).

94.     The use of the term "healthy" is not a health claim but rather an implied nutrient content claim about general nutrition that is defined by FDA regulation.

95.     21 C.F.R. § 101.65, which has been adopted by California, sets certain minimum nutritional requirements for making an implied nutrient content claim that a product is healthy. For example, for unspecified foods the food must supply at least 10 percent of the RDI of one or more specified nutrients.  Defendants have misrepresented the healthiness of their products while failing to meet the regulatory requirements for making such claims.  In general, the term may be used in labeling an individual food product that:

Qualifies as both low fat and low saturated fat;

Contains 480 mg or less of sodium per reference amount and per labeled serving, and per 50 g (as prepared for typically rehydrated foods) if the food has a reference amount of 30 g or 2 tbsps or less;

Does not exceed the disclosure level for cholesterol (*e.g.*, for most individual food products, 60 mg or less per reference amount and per labeled serving size); *and*

Except for raw fruits and vegetables, certain frozen or canned fruits and vegetables, and enriched cereal-grain products that conform to a standard of identity, provides at least 10% of the daily value (DV) of vitamin A, vitamin C, calcium, iron, protein, *or* fiber per reference amount.

Where eligibility is based on a nutrient that has been added to the food, such fortification must comply with FDA's fortification policy.

21 C.F.R. § 101.65(d)(2).

96.     FDA's regulation on the use of the term healthy also encompasses other, derivative uses of the term health (*e.g.*, healthful, healthier) in food labeling. 21 C.F.R. § 101.65(d).

97.     Twinings has violated the provisions of 21 C.F.R. §101.13, 21 C.F.R. §101.14, C.F.R. §21 C.F.R. §101.54, 21 C.F.R. §101.65, 21 U.S.C. §321(g)(1)(D), 21 U.S.C. §321(m) and 21 U.S.C. §352(f)(1) on a number of its products and on its websites. For example, the claim on each of the green tea package front labels: "*Healthy tea experience*" and the claim on the package top panel: "*A natural Source of Protective Antioxidants*" is in violation of the aforesaid law."

98.     Likewise the numerous claimed health benefits appearing on Twinings' website which Plaintiff had reviewed on several occasions during the Class Period are in violation of the aforesaid laws.

99.     As FDA found in regard to the therapeutic claims made by Unilever/Lipton and Diaspora Tea & Herb Co. discussed above, the therapeutic claims on Twinings' website and on its labels establish that their products are drugs because they are intended for use in the cure, mitigation, treatment, or prevention of disease. Twinings' Misbranded Food Products are not generally recognized as safe and effective for the above referenced uses and, therefore, the products are "new drugs" under section 201(p) of 21 U.S.C. § 321(p).  New drugs may not be legally marketed in the U.S. without **prior** approval from FDA as described in section 505(a) of 21 U.S.C. § 355(a). FDA approves a new drug on the basis of scientific data submitted by a drug sponsor to demonstrate that the drug is safe and effective. Twinings' health claims on its website are deceptive, misleading and unlawful.

100.     As discussed above and as shown in Exhibits 2 and 3, the FDA has conducted reviews of similar products to Twinings' tea products and concluded that those companies were "in violation of the Federal Food, Drug, and Cosmetic Act … and the applicable regulations in Title 21, Code of Federal Regulations, Part 101 (21 CFR 101)." FDA found the products to be misbranded stating, "Your product is offered for conditions that are not amenable to self-diagnosis and treatment by individuals who are not medical practitioners; therefore, adequate directions for use cannot be written so that a layperson can use this drug safely for its intended purposes. Thus, your … product is misbranded under section 502(f)(1) of the Act in that the labeling for this drug fails to bear adequate directions for use [21 U.S.C. § 352(f)(1)]."*See* Exhibits 2 and 3.

101.     The package front panel of Twinings' Misbranded Food Products claims a level of "*protective antioxidants*" and "*healthy tea experience*" but their products do not contain any antioxidant substance or nutrient with an established RDI.  As set out above it also makes various health related claims on its website of health benefits to be derived from using its products but, as with the Lipton and Diaspora Tea & Herb Co. products, Twinings' tea products do not have approval from FDA to make the health related claims. In fact some of the health claims made by Twinings on its websites were specifically condemned by the FDA in finding the products of Unilever and Diaspora Tea misbranded. For example Diaspora Tea's products were found to be

1    misbranded because it claimed: "The powerful antioxidants found in tea are believed to help

2    prevent cancer [and] lower cholesterol…." Likewise, Unilever's products were found to be

3    misbranded because it claimed on its website "[F]our recent studies in people at risk for coronary

4    disease have shown a significant cholesterol lowering effect from tea or tea flavonoids".   Yet as

5    indicated in the quotations from its website appearing above and which was reviewed by Plaintiff

6    Twinings continues to claim its tea products "… *have many health benefits"* and *"boosts your*

7    *immune system"* and *"increase metabolism and help maintain healthy skin and complexion",*

8    *"promote restful sleep and help with digestion", "maintain regular heartbeat and regulate fluid*

9    *levels … bone growth". "stop plaque, which can prevent gum disease and reduce bad breath",*

10   and *"help reduce the effects of damaging free radicals".* As with Unilever and Diaspora Tea,

11   these health related claims are in violation of 21 U.S.C. § 352(f)(1) and therefore the Twinings

12   products are misbranded.

        102.   Plaintiff saw the health related claims on the packages and on Defendant's website

14   prior to purchasing Defendant's products at various times during the Class Period and relied on

15   the Defendant's health claims which influenced her decision to purchase the Defendant's

16   products. These unlawful claims continue to be made on Defendant's packaging and websites to

17   this day. Plaintiff would not have bought the products had she known Defendant's claims were

18   unlawful, false, misleading, unapproved and that the products were misbranded.

        103.   Plaintiff and members of the Class were misled into the belief that such claims

20   were legal and had passed regulatory muster and were supported by science capable of securing

21   regulatory acceptance. Because this was not the case, the Plaintiff and members of the Class have

22   been deceived.

        104.   Defendant's materials and advertisements not only violate regulations adopted by

24   California such as 21 C.F.R. § 101.14, they also violate California Health & Safety Code §

25   110403 which prohibits the advertisement of products that are represented to have any effect on

26   enumerated conditions, disorders and diseases unless the claims have federal approval.

        105.   Defendant's health claims were also improper because of their inadequate

28   nutritional profiles.

106.    21 C.F.R. § 101.14, which has been expressly adopted by California, prohibits manufacturers from making any health claim about products that have inadequate nutrient levels.

107.    In addition, 21 C.F.R. § 101.65, which has been adopted by California, sets certain minimum nutritional requirements for making an implied nutrient content claim that a product is healthy.  For example, for unspecified foods the food must be low in fat, saturated fat, sodium and cholesterol and supply at least 10 percent of the RDI of one or more specified nutrients.

108.    Defendant has misrepresented the healthiness of its products while failing to meet the regulatory thresholds for making such claims either because the products lack minimum nutritional requirements to make such a claim.

109.    Defendant Misbranded Food Products violate 21 C.F.R. § 101.14 or 21 C.F.R. § 101.65 as well as 21 C.F.R. § §101.13 and 101.54

110.    Plaintiff saw such health related claims and relied on the Defendant's health claims, which influenced her decision to purchase the Defendant's products. Plaintiff would not have bought the products had she known Defendant's products failed to meet the minimum nutritional threshold for such health claims.

111.    Plaintiff and members of the Class were misled into the belief that Defendant's products would provide the claimed health benefits and met the minimum nutritional thresholds for the health claims that were made about them. Because this was not the case, the Plaintiff and members of the Class have been deceived.

112.    Plaintiff and members of the Class have been misled by Defendant's unlawful labeling practices and actions into purchasing products they would not have otherwise purchased had they known the truth about these products. Plaintiff and members of the Class who purchased these products paid an unwarranted premium for these products.

113.    Defendant's health related claims are false and misleading and the products are in this respect misbranded under identical California and federal laws, Misbranded products cannot be legally sold and thus have no economic value and are legally worthless.

### D.    Defendant Has Violated California Law

114.    The package front panel of Twinings' Misbranded Food Products claims a level of "antioxidants" but their products do not contain any antioxidant substance or nutrient with an established RDI.  Twinings makes various health related claims of benefits to be derived from using its products but, as with the Lipton and Diaspora Tea & Herb Co. products, Twinings' tea products do not have approval from FDA to make the health related claims. Moreover, the health related claims are in violation of 21 U.S.C. § 352(f)(1) and therefore the products are misbranded.

115.    Defendant has manufactured, advertised, distributed and sold products that are misbranded under California law. Misbranded products cannot be legally manufactured, advertised, distributed, sold or held and have no economic value and are legally worthless as a matter of law.

116.    Defendant has violated California Health & Safety Code §§ 109885 and 110390 which make it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product.

117.    Defendant has violated California Health & Safety Code § 110395 which makes it unlawful to manufacture, sell, deliver, hold or offer to sell any misbranded food.

118.    Defendant has violated California Health & Safety Code § 110398 which makes it unlawful to deliver or proffer for delivery any food that has been falsely advertised.

119.    Defendant has violated California Health & Safety Code § 110660 because its labeling is false and misleading in one or more ways, as follows:

120.    They are misbranded under California Health & Safety Code § 110665 because their labeling fails to conform to the requirements for nutrient labeling set forth in 21 U.S.C. § 343(q) and the regulations adopted thereto;

121.    They are misbranded under California Health & Safety Code § 110670 because their labeling fails to conform with the requirements for nutrient content and health claims set forth in 21 U.S.C. § 343(r) and the regulations adopted thereto; and

122.    They are misbranded under California Health & Safety Code § 110705 because words, statements and other information required by the Sherman Law to appear on their labeling either are missing or not sufficiently conspicuous.

123.    Defendant has violated California Health & Safety Code § 110760 which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded.

124.    Defendant has violated California Health & Safety Code § 110765 that makes it unlawful for any person to misbrand any food.

125.    Defendant has violated California Health & Safety Code § 110770 which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for deliver any such food.

126.    Defendant has violated the standard set by 21 C.F.R. § 101.2, which has been incorporated by reference in the Sherman Law, by failing to include on their product labels the nutritional information required by law.

127.    Defendant has violated the standards set by 21 CFR §§ 101.13, and 101.54, which have been adopted by reference in the Sherman Law, by including unauthorized antioxidant and other nutrient claims on their products. Defendant has violated the standards set by 21 CFR §§ 101.14, and 101.65, which have been adopted by reference in the Sherman Law, by including unauthorized health and healthy claims on their products.

**E.    <u>Plaintiff Purchased Defendant's Misbranded Food Products</u>**

128.    Plaintiff cares about the nutritional content of food and seeks to maintain a healthy diet.

129.    Plaintiff purchased Defendant's Misbranded Food Products at issue in this Third Amended Complaint and throughout the Class Period.

130.    Prior to making her decisions to purchase Defendant's products Plaintiff read the labels and had reviewed the aforesaid information on the website regarding the health benefits to be gained from consuming Defendant's products.

131.    Plaintiff purchased a wide variety of Defendant's Misbranded Food Products at issue in this Third Amended Complaint on numerous occasions throughout the Class Period including, but not limited to, the following products: Green Tea, Jasmine Green Tea, Green Tea Decaffeinated, Earl Grey Black Tea, Black Tea with Lemon Organic and Fair Trade Certified, and Lemon Twist (black tea).

132.    Plaintiff read the labels on Defendant's Misbranded Food Products, including the antioxidant, nutrient content, and health claims, where applicable, before purchasing them. Plaintiff would have foregone purchasing Defendant's products and bought other products readily available at a lower price.

133.    Plaintiff reasonably relied on Defendant's package labeling and packaging and product placement. Plaintiff read Defendant's website and web claims concerning Defendant's Misbranded Food Products including the antioxidant related nutrient content and health labeling claims including, "*natural source of antioxidants*", "*rich in antioxidants*"; "*Black and green teas also contain Vitamins A, B1, B2 and B6, along with calcium, zinc and folic acid; and Tea is also a rich source of potassium*" and based and justified the decision to purchase Defendant's products in substantial part on Defendant's package labeling including the nutrient (antioxidant and other) content claims and health labeling claims, and representations related to Defendant's food products before purchasing them.

134.    At the point of sale, Plaintiff did not know, and had no reason to know, that Defendant's products were misbranded as set forth herein and did not contain the healthful benefits claimed by the Defendant and would not have bought the products, or paid a premium for them, had she known the truth about them.

135.    At point of sale, Plaintiff did not know, and had no reason to know, that Defendant's nutrient content (antioxidant and otherwise) and health claims including "*rich in antioxidants*"; or "*natural source of antioxidants*"; or "*Black and green teas also contain Vitamins A, B1, B2 and B6, along with calcium, zinc and folic acid;, Tea is also a rich source of potassium—vital for maintaining a normal heartbeat and regulating fluid levels in cells and manganese, an essential mineral for bone growth*" claims on the products' labels or Defendant's

1   website and were false, unlawful and unauthorized as set forth herein, and would not have bought

2   the products had she known the truth about them.

3          136.    After Plaintiff learned that Defendant's Misbranded Food Products are falsely

4   labeled, she stopped purchasing them.

5          137.    Plaintiff justified the decision to purchase Defendant's products in substantial part

6   on Defendant's false and unlawful representations.

7          138.    As a result of Defendant's misrepresentations, Plaintiff and thousands of others in

8   California purchased the Misbranded Food Products at issue.

9          139.    Defendant's labeling, advertising and marketing as alleged herein are false and

10   misleading and were designed to increase sales of the products at issue.  Defendant's

11   misrepresentations are part of an extensive labeling, advertising and marketing campaign, and a

12   reasonable person would attach importance to Defendant's representations in determining

13   whether to purchase the products at issue.

14          140.    A reasonable person would also attach importance to whether Defendant's

15   products were legally salable, and capable of legal possession, and to Defendant's representations

16   about these issues in determining whether to purchase the products at issue.  Plaintiff would not

17   have purchased Defendant's Misbranded Food Products had she known they were not capable of

18   being legally sold or held.

19          141.    These Misbranded Food Products 1) whose essential characteristics had been

20   misrepresented by the Defendant; 2) which had their nutritional and health benefits

21   misrepresented and overstated by the Defendant, and 3) which were misbranded products which

22   could not be resold and whose very possession was illegal; had no economic value; and were

23   worthless to the Plaintiff and as a matter of law.

24          **F.      All Misbranded Food Products Are Substantially Similar**

25          142.    Defendant's Misbranded Food Products, i.e., all green, black and white teas, are

26   substantially similar. All green, black and white tea products come from the same plant—

27   Camellia sinensis. The process used (fermentation, oxidation, etc.) determines classification of

28   the tea.

143.    The Misbranded Food Products have the same labels, labeling, packaging, and sizes as shown by way of example in Exhibit 1. The Defendant makes the same antioxidant related nutrient content claims on the labels of all of its green tea products and likewise the same antioxidant related nutrient content claims on the labels of all of its black and white teas Moreover, on its website the Defendant makes the same unlawful nutrient content (antioxidant and otherwise) claims and health about all of its green, black and white teas.

144.    The Misbranded Food Products are the same product, tea from the Camellia sinensis plant or the rooibos plant.  The only difference in the Misbranded Food Products is the flavor of the tea. The same or substantially similar antioxidant related nutrient content claims are made on all Twinings tea products, those that Plaintiff purchased and those that she did not purchase. The nutrient content (antioxidant and otherwise) claims appearing on Twinings' website (and which Plaintiff reviewed at various times during the class period) are not product specific but relate in some instances to all tea products; in some instances to all green tea products; in some instances to all black tea products; in some instances to all green and black tea products, in some instances to all white tea products.

145.    Because of the similarity of the products (tea) and the claims (nutrient content— antioxidant and other) claims and for judicial economy the Misbranded Food Products should all be included in the class.

## CLASS ACTION ALLEGATIONS

146.    Plaintiff brings this action as a class action pursuant to Federal Rule of Procedure 23(b)(2) and 23(b)(3) on behalf of the following class:

> All persons in California who purchased Defendant's green, black and white tea products for personal or household use since May 2, 2008 (the "Class").

147.    The following persons are expressly excluded from the Class:  (1) Defendant and its subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the Court to which this case is assigned and its staff.

148.    This action can be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

149.    <u>Numerosity</u>:  Based upon Defendant's publicly available sales data with respect to the misbranded products at issue, it is estimated that the Class numbers in the thousands, and that joinder of all Class members is impracticable.

150.    <u>Common Questions Predominate</u>:  This action involves common questions of law and fact applicable to each Class member that predominate over questions that affect only individual Class members.  Thus, proof of a common set of facts will establish the right of each Class member to recover.  Questions of law and fact common to each Class member include, for example:

a.    Whether Defendant engaged in unlawful, unfair or deceptive business practices by failing to properly package and label its Misbranded Food Products sold to consumers;

b.    Whether the food products at issue were misbranded or unlawfully packaged and labeled as a matter of law;

c.    Whether Defendant made unlawful and misleading antioxidant, nutrient content and health related claims with respect to the food products it sold to consumers;

d.    Whether Defendant violated California Bus. & Prof. Code § 17200 *et seq*., California Bus. & Prof. Code § 17500 *et seq*., the Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq*., and the Sherman Law;

e.    Whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;

f.    Whether Defendant's unlawful, unfair and/or deceptive practices harmed Plaintiff and the Class; and

g.    Whether Defendant was unjustly enriched by its deceptive practices.

151.    <u>Typicality</u>:  Plaintiff's claims are typical of the claims of the Class because Plaintiff bought Defendant's Misbranded Food Products during the Class Period.  Defendant's unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced.  Plaintiff and the Class sustained similar injuries arising out of Defendant's conduct in violation of California law.  The injuries of each

member of the Class were caused directly by Defendant's wrongful conduct. In addition, the factual underpinning of Defendant's misconduct is common to all Class members and represents a common thread of misconduct resulting in injury to all members of the Class. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the Class members and are based on the same legal theories.

152. <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class. Neither Plaintiff nor Plaintiff's counsel have any interests that conflict with or are antagonistic to the interests of the Class members. Plaintiff has retained highly competent and experienced class action attorneys to represent her interests and those of the members of the Class. Plaintiff and Plaintiff's counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and her counsel are aware of their fiduciary responsibilities to the Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

153. <u>Superiority</u>: There is no plain, speedy or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Further, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Class treatment of common questions of law and fact would also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the Court and the litigants, and will promote consistency and efficiency of adjudication.

154.    The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

155.    The prerequisites to maintaining a class action pursuant to Fed. R. Civ. P. 23(b)(3) are met as questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

156.    Plaintiff and Plaintiff's counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Business and Professions Code § 17200 *et seq.*
#### Unlawful Business Acts and Practices

157.    Plaintiff incorporates by reference each allegation set forth above.

158.    Defendant's conduct constitutes unlawful business acts and practices.

159.    Defendant sold Misbranded Food Products nationwide and in California during the Class Period.

160.    Defendant is a corporation and, therefore, is a "person" within the meaning of the Sherman Law.

161.    Defendant's business practices are unlawful under § 17200 *et seq.* by virtue of Defendant's violations of the advertising provisions of the Sherman Law (Article 3) and the misbranded food provisions of the Sherman Law (Article 6).

162.    Defendant's business practices are unlawful under § 17200 *et seq.* by virtue of Defendant's violations of § 17500 *et seq.*, which forbids untrue and misleading advertising.

163.    Defendant's business practices are unlawful under § 17200 *et seq.* by virtue of Defendant's violations of the Consumer Legal Remedies Act, Cal. Civil Code § 1750 *et seq.*

164.    Defendant sold Plaintiff and the Class Misbranded Food Products that were not capable of being sold or held legally and which had no economic value and were legally worthless. Plaintiff and the Class paid a premium for the Misbranded Food Products.

165.    As a result of Defendant's illegal business practices, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and to restore to any Class Member any money paid for the Misbranded Food Products.

166.    Defendant's unlawful business acts present a threat and reasonable continued likelihood of injury to Plaintiff and the Class.

167.    As a result of Defendant's conduct, Plaintiff and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiff and the Class.

## SECOND CAUSE OF ACTION

### Business and Professions Code § 17200 *et seq.*
### <u>Unfair Business Acts and Practices</u>

168.    Plaintiff incorporates by reference each allegation set forth above.

169.    Defendant's conduct as set forth herein constitutes unfair business acts and practices.

170.    Defendant sold Misbranded Food Products nationwide and in California during the Class Period.

171.    Plaintiff and members of the Class suffered a substantial injury by virtue of buying Defendant's Misbranded Food Products that they would not have purchased absent Defendant's illegal conduct as set forth herein.

172.    Defendant's deceptive marketing, advertising, packaging and labeling of its Misbranded Food Products and its sale of unsalable Misbranded Food Products that were illegal

1    to possess were of no benefit to consumers, and the harm to consumers and competition is

2    substantial.

3           173.    Defendant sold Plaintiff and the Class Misbranded Food Products that were not

4    capable of being legally sold or held and that had no economic value and were legally worthless.

5    Plaintiff and the Class paid a premium for the Misbranded Food Products.

6           174.    Plaintiff and the Class who purchased Defendant's Misbranded Food Products had

7    no way of reasonably knowing that the products were misbranded and were not properly

8    marketed, advertised, packaged and labeled, and thus could not have reasonably avoided the

9    injury suffered.

10          175.    The consequences of Defendant's conduct as set forth herein outweigh any

11   justification, motive or reason therefore.  Defendant's conduct is and continues to be immoral,

12   unethical, illegal, unscrupulous, contrary to public policy, and is substantially injurious to

13   Plaintiff and the Class.

14          176.    As a result of Defendant's conduct, Plaintiff and the Class, pursuant to Business

15   and Professions Code § 17203, are entitled to an order enjoining such future conduct by

16   Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's

17   ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by

18   Plaintiff and the Class.

19                              **THIRD CAUSE OF ACTION**

20              **Business and Professions Code § 17200 *et seq.***
                **Fraudulent Business Acts and Practices**

21          177.    Plaintiff incorporates by reference each allegation set forth above.

22          178.    Defendant's conduct as set forth herein constitutes fraudulent business practices

23   under California Business and Professions Code sections § 17200 *et seq.*

24          179.    Defendant sold Misbranded Food products nationwide and in California during the

25   Class Period.

26          180.    Defendant's misleading marketing, advertising, packaging and labeling of the

27   Misbranded Food Products were likely to deceive reasonable consumers, and in fact, Plaintiff and

28

THIRD AMENDED CLASS ACTION COMPLAINT                                                      47
CASE NO. 12-CV-02646 (RMW)

1    members of the Class were deceived.  Defendant has engaged in fraudulent business acts and

2    practices.

3         181.    Defendant's fraud and deception caused Plaintiff and the Class to purchase

4    Defendant's Misbranded Food Products that they would otherwise not have purchased had they

5    known the true nature of those products.

6         182.    Defendant sold Plaintiff and the Class Misbranded Food Products that were not

7    capable of being sold or held legally and that had no economic value and were legally worthless.

8    Plaintiff and the Class paid a premium price for the Misbranded Food Products.

9         183.    As a result of Defendant's conduct as set forth herein, Plaintiff and the Class,

10   pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future

11   conduct by Defendant, and such other orders and judgments which may be necessary to disgorge

12   Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food

13   Products by Plaintiff and the Class.

14                          **FOURTH CAUSE OF ACTION**

15                    **Business and Professions Code § 17500** *et seq.*
                      **Misleading and Deceptive Advertising**
16
17        184.    Plaintiff incorporates by reference each allegation set forth above.

18        185.    Plaintiff asserts this cause of action for violations of California Business and

     Professions Code § 17500 *et seq.* for misleading and deceptive advertising against Defendant.
19
20        186.    Defendant sold Misbranded Food Products nationwide and in California during the

21   Class Period.

22        187.    Defendant engaged in a scheme of offering Defendant's Misbranded Food

23   Products for sale to Plaintiff and members of the Class by way of, *inter alia*, product packaging

     and labeling, and other promotional materials.  These materials misrepresented and/or omitted the
24
25   true contents and nature of Defendant's Misbranded Food Products.  Defendant's advertisements

26   and inducements were made within California and come within the definition of advertising as

27   contained in Business and Professions Code §17500 *et seq.* in that such product packaging and

28   labeling, and promotional materials were intended as inducements to purchase Defendant's

1   Misbranded Food Products and are statements disseminated by Defendant to Plaintiff and the

2   Class that were intended to reach members of the Class.  Defendant knew, or in the exercise of

3   reasonable care should have known, that these statements were misleading and deceptive as set

4   forth herein.

5          188.   In furtherance of its plan and scheme, Defendant prepared and distributed within

6   California and nationwide via product packaging and labeling, and other promotional materials,

7   statements that misleadingly and deceptively represented the composition and nature of

8   Defendant's Misbranded Food Products.  Plaintiff and the Class necessarily and reasonably relied

9   on Defendant's materials, and were the intended targets of such representations.

10          189.   Defendant's conduct in disseminating misleading and deceptive statements in

11   California and nationwide to Plaintiff and the Class was and is likely to deceive reasonable

12   consumers by obfuscating the true composition and nature of Defendant's Misbranded Food

13   Products in violation of the "misleading prong" of California Business and Professions Code §

14   17500 *et seq.*

15          190.   As a result of Defendant's violations of the "misleading prong" of California

16   Business and Professions Code § 17500 *et seq.*, Defendant has been unjustly enriched at the

17   expense of Plaintiff and the Class.  Misbranded products cannot be legally sold or held and had

18   no economic value and are legally worthless. Plaintiff and the Class paid a premium price for the

19   Misbranded Food Products.

20          191.   Plaintiff and the Class, pursuant to Business and Professions Code § 17535, are

21   entitled to an order enjoining such future conduct by Defendant, and such other orders and

22   judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any

23   money paid for Defendant's Misbranded Food Products by Plaintiff and the Class.

24   **FIFTH CAUSE OF ACTION**

25   **Business and Professions Code § 17500 *et seq.***
**<u>Untrue Advertising</u>**

26          192.   Plaintiff incorporates by reference each allegation set forth above.

27

28

193.     Plaintiff asserts this cause of action against Defendant for violations of California Business and Professions Code § 17500 *et seq.*, regarding untrue advertising.

194.     Defendant sold mislabeled Misbranded Food Products nationwide and in California during the Class Period.

195.     Defendant engaged in a scheme of offering Defendant's Misbranded Food Products for sale to Plaintiff and the Class by way of product packaging and labeling, and other promotional materials.  These materials misrepresented and/or omitted the true contents and nature of Defendant's Misbranded Food Products.  Defendant's advertisements and inducements were made in California and come within the definition of advertising as contained in Business and Professions Code §17500 *et seq.* in that the product packaging and labeling, and promotional materials were intended as inducements to purchase Defendant's Misbranded Food Products, and are statements disseminated by Defendant to Plaintiff and the Class.  Defendant knew, or in the exercise of reasonable care should have known, that these statements were untrue.

196.     In furtherance of its plan and scheme, Defendant prepared and distributed in California and nationwide via product packaging and labeling, and other promotional materials, statements that falsely advertise the composition of Defendant's Misbranded Food Products, and falsely misrepresented the nature of those products.  Plaintiff and the Class were the intended targets of such representations and would reasonably be deceived by Defendant's materials.

197.     Defendant's conduct in disseminating untrue advertising throughout California and nationwide deceived Plaintiff and members of the Class by obfuscating the contents, nature and quality of Defendant's Misbranded Food Products in violation of the "untrue prong" of California Business and Professions Code § 17500.

198.     As a result of Defendant's violations of the "untrue prong" of California Business and Professions Code § 17500 *et seq.*, Defendant has been unjustly enriched at the expense of Plaintiff and the Class.  Misbranded products cannot be legally sold or held and had no economic value and are legally worthless. Plaintiff and the Class paid a premium price for the Misbranded Food Products.

199.    Plaintiff and the Class, pursuant to Business and Professions Code § 17535, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiff and the Class.

**SIXTH CAUSE OF ACTION**

**Consumers Legal Remedies Act, Cal. Civ. Code §1750 *et seq.***

200.    Plaintiff incorporates by reference each allegation set forth above.

201.    This sixth cause of action is brought pursuant to the CLRA.

202.    Defendant's acts were and are willful, oppressive and fraudulent, thus supporting an award of punitive damages.

203.    Plaintiff and the Class are entitled to actual and punitive damages against Defendant for its violations of the CLRA.  In addition, pursuant to Cal. Civ. Code § 1782(a)(2), Plaintiff and the Class are entitled to an order enjoining the above-described acts and practices, providing restitution to Plaintiff and the Class, ordering payment of costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court pursuant to Cal. Civ. Code § 1780.

204.    Defendant's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale of goods or services to consumers.

205.    Defendant sold Misbranded Food Products nationwide and in California during the Class Period.

206.    Plaintiff and members of the Class are "consumers" as that term is defined by the CLRA in Cal. Civ. Code §1761(d).

207.    Defendant's Misbranded Food Products were and are "goods" within the meaning of Cal. Civ. Code §1761(a).

208.    By engaging in the conduct set forth herein, Defendant violated and continues to violate Section 1770(a)(5) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices in that it misrepresents the particular ingredients, characteristics, uses, benefits and quantities of the goods.

1    209.    By engaging in the conduct set forth herein, Defendant violated and continues to

2    violate Section 1770(a)(7) of the CLRA, because Defendant's conduct constitutes unfair methods

3    of competition and unfair or fraudulent acts or practices in that it misrepresents the particular

4    standard, quality or grade of the goods.

5    210.    By engaging in the conduct set forth herein, Defendant violated and continues to

6    violate Section 1770(a)(9) of the CLRA, because Defendant's conduct constitutes unfair methods

7    of competition and unfair or fraudulent acts or practices in that Defendant advertises goods with

8    the intent not to sell the goods as advertised.

9    211.    By engaging in the conduct set forth herein, Defendant has violated and continue

10   to violate Section 1770(a)(16) of the CLRA, because Defendant's conduct constitutes unfair

11   methods of competition and unfair or fraudulent acts or practices in that Defendant represents that

12   a subject of a transaction has been supplied in accordance with a previous representation when

13   they have not.

14   212.    Plaintiff requests that the Court enjoin Defendant from continuing to employ the

15   unlawful methods, acts and practices alleged herein pursuant to Cal. Civ. Code § 1780(a)(2).  If

16   Defendant is not restrained from engaging in these practices in the future, Plaintiff and the Class

17   will continue to suffer harm.

18   213.    Pursuant to Section 1782(a) of the CLRA, Plaintiff's counsel served Defendant

19   with notice of Defendant's violations of the CLRA.  Plaintiff's counsel served Defendant by

20   certified mail, return receipt requested.

21   214.    Defendant has failed to provide appropriate relief for its violations of the CLRA

22   within 30 days of its receipt of the CLRA demand notice.  Accordingly, pursuant to Sections

23   1780 and 1782(b) of the CLRA, Plaintiff is entitled to recover actual damages, punitive damages,

24   attorneys' fees and costs, and any other relief the Court deems proper.

25   215.    Consequently, Plaintiff and the Class are entitled to actual and punitive damages

26   against Defendant for its violations of the CLRA.  In addition, pursuant to Cal. Civ. Code §

27   1782(a)(2), Plaintiff and the Class are entitled to an order enjoining the above-described acts and

28   practices, providing restitution to Plaintiff and the Class, ordering payment of costs and attorneys'

1  fees, and any other relief deemed appropriate and proper by the Court pursuant to Cal. Civ. Code

2  § 1780.

3

### JURY DEMAND

4

216.    Plaintiff hereby demands a trial by jury of her and the Class' claims.

5

### PRAYER FOR RELIEF

6

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, and on

7

behalf of the general public, prays for judgment against Defendant as follows:

8

A.      For an order certifying this case as a class action and appointing Plaintiff and her

9

counsel to represent the Class;

10

B.      For an order awarding, as appropriate, damages, restitution or disgorgement to

11

Plaintiff and the Class;

12

C.      For an order requiring Defendant to immediately cease and desist from selling its

13

Misbranded Food Products in violation of law; enjoining Defendant from continuing to market,

14

advertise, distribute, and sell these products in the unlawful manner described herein; and

15

ordering Defendant to engage in corrective action;

16

D.      For all remedies available pursuant to Cal. Civ. Code § 1780;

17

E.      For an order awarding attorneys' fees and costs;

18

F.      For an order awarding punitive damages;

19

G.      For an order awarding pre-and post-judgment interest; and

20

H.      For an order providing such further relief as this Court deems proper.

21

Dated: June 19, 2013                 Respectfully submitted,

22

23                                                */s/ Ben F. Pierce Gore*
                                        Ben F. Pierce Gore (SBN 128515)
24                                      PRATT & ASSOCIATES
                                        1871 The Alameda
25                                      Suite 425
                                        San Jose, CA  95126
26                                      (408) 369-0800
                                        pgore@prattattorneys.com

27                                      *Attorneys for Plaintiff*

28

1

**CERTIFICATE OF SERVICE**

2        I hereby certify that I have on June 19, 2013 filed and served through the Court's ECF

3  system a true and correct copy of the foregoing.

4

                                    _/s/  Ben F. Pierce Gore_____
5                                      Ben F.Pierce Gore

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28