UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NANCY LANOVAZ, on behalf of herself and all others similarly situated, | Case No. C-12-02646-RMW |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| TWININGS NORTH AMERICA, INC., | |
| Defendant. | [Re Docket No. 69] |

Plaintiff Nancy Lanovaz brings claims on her own behalf and on behalf of a purported class of tea purchasers against Twinings for its alleged "misbranded" green, black, and white teas. She claims that Twinings' tea labels and website violate federal regulations, which California has incorporated into state law, and are misleading. Based on evidence obtained during the deposition of Lanovaz, Twinings now moves for summary judgment arguing that Lanovaz (1) did not rely on the allegedly misleading statements and they were not material to her purchasing decisions; (2) cannot establish that Twinings made unlawful nutrient content or health claims; and (3) does not have Article III standing for her claims.

# I. BACKGROUND

## A. Procedural History

Lanovaz alleges that she paid a premium for Twinings' green and black tea and would not have purchased them but for Twinings' unlawful labeling.  She asserts that Twinings violated California's Unfair Competition Law ("UCL"), California's False Advertising Law ("FAL"), and the Consumers Legal Remedies Act ("CLRA").  Third Amended Complaint ("TAC") ¶¶ 157-215, Dkt. No. 62.  Lanovaz seeks monetary and injunctive relief for herself and on behalf of a purported class of tea purchasers who bought allegedly mislabeled products.  At the heart of Lanovaz's claim is a label describing Twinings' tea as a "Natural Source of Antioxidants," which currently appears on the 51 varieties of Twinings' tea at issue in this lawsuit.[1]  Twinings' green teas also include a longer text description on the label, which states in relevant part, "[a] natural source of protective antioxidants . . . Twinings' Green Teas provide a great tasting and healthy tea drinking experience." Stern Decl. Ex. B, Dkt. No. 70-2.  Twinings' website also contains statements about antioxidants.

Lanovaz began purchasing Twinings' Earl Grey Tea (a black tea) approximately twenty years ago.  Lanovaz Depo. 15:4-22, Dkt. Nos. 70-1, 75-1.[2]  She began purchasing Twinings' Green Tea six to eight years ago, after a friend told her that it was healthy.  *Id.* at 94:12-14, 100:8-13.  She also occasionally purchased Twinings' decaffeinated green tea, jasmine green tea, lemon twist, and black tea with lemon.  *Id.* at 6:16-19.  Lanovaz stopped purchasing Twinings teas on April 30, 2012 when she first met with her attorney.  *Id.* at 34:23-36:10.

The gravamen of Lanovaz's complaint is that Twinings' labels violate U.S. Food and Drug Administration ("FDA") labeling regulations and thus are illegal under California law, which has adopted these regulations.[3]  Although no one disputes that Twinings' tea contains flavonoids, a type of antioxidant, the FDA does not allow nutrient content claims about flavonoids because the FDA

---

[1] The format of the label varies between varieties of tea, but the content is the same.  *See* Stern Decl. Ex. B, Dkt. No. 70-2 (showing a Twinings' Green Tea and a Twinings' Earl Grey Tea box).

[2] The parties have each filed slightly different excerpts from the July 18, 2013 deposition of Nancy Lanovaz.  *See* Dkt. Nos. 70-1, 75-1.  As both sets of excerpts reflect the same deposition, the court will simply refer to the "Lanovaz Depo."

[3] California Health & Safety Code section 110100(a) adopts "[a]ll food labeling regulations of the FDA and any amendments to those regulations" and section 110670 provides that "[a]ny food is misbranded if its labeling does not conform with the requirements for nutrient content or health claims as set forth in Section 403(r) (21 U.S.C. Sec. 343(r)) of the federal act and the regulations adopted pursuant thereto."

1    has not established a recommended daily intake for flavonoids.  *See* 21 C.F.R. 101.54(g)(1).

2    Lanovaz argues that Twinings' labels and website are deceptive, misleading, and unlawful even if

3    they are technically true.

4          This court has issued two substantive orders in response to Twinings' motions to dismiss.

5    The first order struck, without prejudice, some of Lanovaz's claims.  Order re 1st MTD, Dkt. No.

6    46.  The second order struck all references from the complaint to sections of the website which

7    Lanovaz did not read and on which she had not relied and dismissed all claims related to labeling of

8    red tea because Lanovaz did not buy any red tea.  Order re 2nd MTD 6, Dkt. No. 60.  But, the court

9    allowed Lanovaz to proceed on claims based on labels and website statements related to Twinings'

10   green, white, and black teas that she did not purchase because they had the same label as teas she

11   did purchase and were essentially the same product.[4]  *Id.* at 2-4.

**B.  Current Motion**

12

13         On June 19, 2013, Lanovaz filed a third amended complaint, which Twinings answered on

14   July 8, 2013.  *See* Dkt. Nos. 62, 65.  Shortly thereafter, once discovery began, Twinings deposed the

15   named plaintiff, Nancy Lanovaz, and then immediately filed the instant summary judgment motion.

16   Dkt. No. 69.  That motion is now before the court and is based on Lanovaz's deposition testimony.

17   The motion is directed at Lanovaz's individual claims rather than the claims of the purported class.

18   Alternatively, Twinings seeks "to strike the class averments on 'typicality' grounds as to the

19   putative class members who purchased the 45 products listed in the Third Amended Complaint that

20   Plaintiff did not actually purchase.  *Id.* at vi, lines 15-17.

21                                      **II.  ANALYSIS**

22   **A.  Standard for Summary Judgment**

23         Summary judgment is proper where the pleadings, discovery, and affidavits demonstrate that

24   "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

25   matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the

26   case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact

27

28   _____

[4] The court dismissed claims related to red tea because Lanovaz had not purchased any variety of
red tea and it is made from the rooibos plant.  Green, white, and black teas are all made from the
camellia sinensis plant and thus are very similar.

ORDER RE SUMMARY JUDGMENT
Case No. C-12-02646-RMW
SW
                                        - 3 -

is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *See id.* On a summary judgment motion, the moving party may meet its burden by pointing out the absence of evidence to support an element of the non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). To avoid summary judgment, the non-moving party must provide specific facts showing a genuine dispute.

Twinings argues that Lanovaz's statements during her deposition show that she cannot meet her burden to establish the elements of her case. Specifically, Twinings argues that (1) Lanovaz said that she did not rely on the tea labels or website in making her decision to purchase Twinings teas; (2) the product labels do not make nutrient content or health claims as defined under federal regulations; and (3) Lanovaz does not have Article III standing to pursue her UCL, FAL and CRLA claims that seek money damages because she has no evidence that she paid a premium and she cannot seek injunctive relief because she has ceased buying the teas and has no intent to resume. Twinings' contentions are discussed in order.

**B. Lack of Reliance (Causation)**

Twinings asserts that Lanovaz did not rely on its labels or website in deciding to purchase Twinings' teas, and they were not material to her purchasing decisions. Therefore, contends Twinings, Lanovaz's claims fail for lack of causation.

In order to bring a claim under the UCL or FAL, a plaintiff must have suffered "injury in Fact" and lost money or property as a result of unfair competition. Cal. Bus & Prof. Code §§ 17204, 17535. Unfair competition means and includes any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising. Cal. Bus & Prof. Code § 17200. Lanovaz asserts that Twinings' labels and website are unlawful, unfair and fraudulent. Under the UCL's fraud prong, a plaintiff must establish "actual reliance" in order to have standing. *See In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009). Claims arising under the UCL's unfair and unlawful prongs similarly require reliance when the underlying misconduct involves misrepresentation or deception. *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 326 (2011) (requiring reliance for claims based on all three prongs where the claims are based upon false advertising and misrepresentations); *Durell v. Sharp Healthcare,* 183 Cal. App. 4th 1350, 1362-64

1   (2010); *Brazil v. Dole Food Co., Inc.*, 12-CV-01831-LHK, 2013 WL 5312418 (N.D. Cal. Sept. 23,

2   2013).  Reliance is also a requirement for a claim under the CLRA.  *See Durell*, 183 Cal. App. 4th at

3   1366-67 (2010).

4        Lanovaz's claims under all three prongs of the UCL are based on fraud or misrepresentation.

5   *See* TAC ¶¶ 157-183.  Therefore, Lanovaz must prove reliance to be successful on those claims.

6   Twinings argues that Lanovaz's deposition establishes that she did not rely on Twinings' labels or

7   website in making her purchasing decisions and thus summary judgment is appropriate.  Lanovaz

8   counters that Twinings mischaracterizes her deposition testimony and, in any event, she can

9   establish reliance by showing materiality.  *See Kwikset*, 51 Cal. 4th at 332-33.

10       Despite her contention, Lanovaz cannot show reliance based upon a presumption of

11  materiality.  Evidence of materiality only establishes a presumption of reliance, and a presumption

12  cannot survive if the evidence establishes an actual lack of reliance.  *See In re Tobacco II Cases,* 46

13  Cal. 4th 298, 327 (2009); *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 977 (1997).

14  Thus, the question here is whether Lanovaz unequivocally admitted in her deposition that she did

15  not rely on the labels or the website in her purchasing decisions.  If she did not rely on them, her

16  lack of reliance rebuts any presumption of reliance arising from the alleged materiality of the labels

17  or website.

18       To establish reliance, a plaintiff must prove that the misrepresentation was an immediate

19  cause of the injury-producing conduct but it does not have to be the sole or even the predominant or

20  decisive factor.

> While a plaintiff must show that the misrepresentation was an immediate
> cause of the injury-producing conduct, the plaintiff need not demonstrate
> it was the only cause. " 'It is not ... necessary that [the plaintiff's] reliance
> upon the truth of the fraudulent misrepresentation be the sole or even the
> predominant or decisive factor influencing his conduct.... It is enough that
> the representation has played a substantial part, and so had been a
> substantial factor, in influencing his decision.' [Citation.]  Reliance can be
> shown if, in the absence of the misrepresentation, the plaintiff 'in all
> reasonable probability' would not have engaged in the injury-producing
> conduct."  *Id.* (quoting *Mirkin v. Wasserman* 5 Cal. 4th 1082, 1110–1111
> (1993) (conc. & dis. opn. of Kennard, J.)).

*In re Tobacco II Cases*, 46 Cal. 4th at 326.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Twinings contends that *Princess Cruise Lines, Ltd. v. Superior Court* supports its position

2  that summary judgment in a misrepresentation case is appropriate where deposition testimony

3  shows that the plaintiff did not rely on the allegedly false statements.  179 Cal. App. 4th 36, 43-44

4  (2009).  In *Princess Cruise Lines*, the plaintiffs alleged that Princess Cruise Lines had

5  misrepresented the cost of shore excursions.  *Id.*  The court of appeal held that summary judgment

6  in favor of Princess Cruise Lines was appropriate because  plaintiffs stated in deposition that they

7  would go on the shore excursions, "whatever it cost," and thus plaintiffs could not have relied on

8  any alleged misrepresentations about the cost.  *Id.* at 44.  Twinings makes a similar argument here.

9  It contends that Lanovaz testified in her deposition that she would have purchased Twinings' Earl

10  Grey Tea and Twinings' Green Tea without the antioxidant labels and, therefore, cannot establish

11  reliance on the labels or that the labels were a cause of Lanovaz's purchase of Twinings' teas.

12    Q When did you first begin to purchase Twinings Teas? And if you'd like,
     we can separate their GreenTeas from their Earl Grey.

13    A I started purchasing Twinings Tea about 20 years ago.

14    Q And why did you choose Twinings?

15    A I chose Twinings since I was looking for Earl Grey Tea, and that's --
16    Earl Grey was the first Twinings that I chose. No particular reason at that
     time.

17    Q When you first began purchasing Twinings Earl Grey Tea
     approximately 20 years ago, did it have the insignia that appears on
18    Exhibit 2 that you just now circled?

19    A I don't recall.

20    Q When you started purchasing Earl Grey Tea about 20 years ago, was
     that insignia or those words "Natural Source of Antioxidants" important to
21    you?

22     A No, I didn't -- no.

23    Q When did those words first become important to you?

24    A The words became important to me more on the -- the green tea when I
     started to find out more why people drink green tea, and it's healthier for
     them. So I started to look at that more closely.

25    Q Are you saying that insignia on the Earl Grey Tea is not important to
26    you?

27    Mr. GORE: Objection, misstates the witness's prior testimony.  You may
     answer.

28    . . .

THE WITNESS: It is important to me.

MR. STERN: Okay.

Q But what did you mean when you said those words are more important in the green tea than the Earl Grey Tea?

Mr. GORE: Objection, misstates the witness's testimony.  You may answer it.

THE WITNESS: It's when green tea started to become promoted to me more through friends saying that it's healthy for me.

Q At that point, did you switch to Twinings Green Tea and stop buying Earl Grey, or did you continue both?

A I continued both. I started to purchase more green tea but still continued to purchase the Earl Grey Tea.

Lanovaz deposition 15:4 – 16:25.

MR. STERN: Q Ms. Lanovaz, we talked before the break about Exhibits 1 and 2, and the -- the label statements that you identified and circled. My question to you is: Do you believe that you would have bought these two Twinings products even if they didn't have the statements you circled on Exhibits 1 and 2?

A  I would have continued to buy the products without that label, but their label encouraged me -- well, actually, I don't know if I would have -- I started drinking green tea when I knew that they were promoting -- promoted as high in antioxidants.

They're good for me. I would have continued to purchase the Earl Grey Tea.

*Id.* at 46:21 – 47: 9.

Q Imagine for a moment it didn't have that Insignia and we're now 20 years ago, when you first began to purchase Twinings Earl Grey Tea.  If it didn't have the insignia, would you still have purchased it?

A Yes.

Q Okay. And as of April 29th, 2012, same question, if it didn't have that circular insignia, would you have continued to buy the Twinings Earl Grey Tea?

A Probably, yes.

*Id.* at 48:8-18.

MR. STERN: Q And so my question now is the same one as about the green tea that I asked about Earl Grey Tea. The three things you circled, the two banners and the statement on the side, if you could imagine them not being on the green tea, would you still have purchased the Twinings Green Tea?

A Yes.

Q Okay. And would that have been true up until April 29, 2012?

A Yes.

*Id*. at 49:2-21.

Lanovaz argues these passages are taken out of context and when her testimony is read in its entirety it establishes, at a minimum, that there is a material question of fact as to whether Lanovaz relied on the label "natural source of antioxidants" in her purchasing decisions. Although Lanovaz may face an uphill battle in establishing reliance, particularly reliance on the antioxidant label on the Earl Grey black tea box, the court finds a triable issue of fact as to whether or not the label was a "substantial factor, in influencing [Lanovaz's] decision." In re *Tobacco II Cases,* 46 Cal. 4th at 326.

Q Is it correct that you started buying Twinings Green Tea as a result, in part, of the antioxidant labeling on the package?

A Yes, I started drinking green tea because of the information I was receiving about it being healthier because of the antioxidants in it and then -- then seeing on the Twinings Tea the labels were there.

Q At the time you started buying Twinings Green Tea, did you consider buying other green teas to get those health benefits?

A No. *When I bought the green – Twinings Green Tea because I saw the health benefits were promised to me, it was a healthy green tea because the antioxidants were contained in the product.*

Q And prior to that time, you were not a green tea drinker; is that correct?

A Correct.

*Id.*at 84:17 – 85:9 (emphasis added).

Q What effect, if any, did your observing the antioxidant labeling on Twinings Black Teas -- what effect, if any, did that have on your purchase decisions of those teas?

A It -- it affected me that I would -- *I would choose the Twinings Earl Grey Tea when I was shopping for Earl Grey Tea. That I had -- it reinforced that I would buy it and I would buy it more, and it's healthier for me.*

Q As you sit here today, do you recall whether you saw antioxidant labeling on other Twinings Black Teas besides Earl Grey?

A Yeah, it was on the other Green Tea, Jasmine, and -- and on the Lemon Twist, as well as the other teas I bought.

*Id.* at 85:16 – 87:1 (emphasis added)

> THE WITNESS: I bought more green tea at that time [seven years ago] because that's the time I was learning more from friends/people that green tea was good for me, and that's why I bought more green tea and *I still continued to buy the Earl Grey Tea. I didn't choose other brands of Earl – of Earl Grey Tea, other black teas. I chose the Twinings because they also indicated that they were a natural source of antioxidants.*

*Id.* at 97:1-9 (emphasis added).

The essence of Lanovaz's testimony, read in the light most favorable to her, is that approximately seven years ago when her friends discussed with her the healthy aspects of green tea she read the Twinings' label which reinforced what her friends were saying. This contributed to her decision to purchase Twinings green teas and to continue buying Twinings Earl Grey tea in at least the quantity she had been and to buy only the Twinings' brand.

Lanovaz also claims that her reliance claim is supported by the Twinings' website which she says stated that green tea contained antioxidants and was healthy. This website information was a substantial factor in her purchasing decisions. Lanovaz first visited Twinings' website six or seven years ago to learn more about green tea after her friend told her that green tea was good for her-- long after she was a regular purchaser of Twinings' Earl Grey Tea. Lanovaz Depo. 27:11-21, 15:7-8. All that Lanovaz remembers about Twinings' website is that it said that green tea was healthy (*id.* at 27:22-28:18) and reading about green tea, she concluded that "it was healthy for me, it contained antioxidants." *Id.* at 29:5-9; 67:19-23; 101:22-25. She also said that the website reinforced what her friend had told her about green tea, which influenced her decision to purchase green tea. *Id.* at 102:2-8.

Lanovaz does not recall reading anything else on Twinings' website except statements related to green tea. *Id.* at 28:15-29:4. She cannot base a claim on content on Twinings' website that she never saw or relied on. Her deposition testimony establishes that she did not see or rely on any statements on Twinings' website related to black or white tea. *See In re Ferrero Litig.*, 794 F. Supp. 2d 1107, 1112 (S.D. Cal. 2011). Accordingly, although the website may support Lanovaz's claim that she relied on the statement that Twinings' green tea contained antioxidants, it does not

United States District Court
For the Northern District of California

support her claim that she bought black or white tea based upon information gleaned from the website.

## C.   Nutrient Content & Health Claims

Neither party contends that Twinings' tea does not contain antioxidants.  Therefore, to establish liability, Lanovaz needs to establish that Twinings violated the FDA regulations concerning nutrient content or health claims.   Twinings moves for summary judgment, arguing that Lanovaz did not interpret Twinings' labels or website[5] as making nutrient content claims or health claims and thus her claims based on violations of FDA labeling rules fail.

"A claim that expressly or implicitly characterizes the level of a nutrient of the type required to be in nutrition labeling ... (that is, a nutrient content claim) may not be made on the label or in labeling of foods unless the claim is made in accordance with [FDA] regulation[s]."  21 C.F.R. § 101.13(b).  Under California law "[a]ny food is misbranded if its labeling does not conform with the requirements for nutrient content or health claims as set forth in Section 403(r) (21 U.S.C. Sec. 343(r)) of the federal act and the regulations adopted pursuant thereto."  Cal. Health & Safety Code § 110670.  Therefore, Twinings' labels violate the letter of FDA regulations *if* they make a nutrient content or health claim.  Twinings now argues that  its "Natural Source of Antioxidants" label does not make a nutrient content claim because "natural source" does not characterize the level of the nutrient, and even if it did, Lanovaz did not understand it to do so.

The FDA has not officially defined "source of" or "natural source of" as making a nutrient content claim.  But, it has identified similar terms such as "excellent source of," "good source of,"

---

[5] For purposes of this motion, the parties do not seem to dispute that FDA labeling rules should apply to the content on Twinings' website under section 201(m).  21 U.S.C. § 321(m).  Section 201(m) defines labels as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article."  The FDA seems to have taken the position that labeling rules apply to a website if the address for that website appears on the actual label.  *See* March 24, 2011 FDA warning letter to Jonathan's Sprouts Inc., Dkt. No. 76-1, *available at* http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2011/ucm248745; August 23, 2010 FDA warning letter to Unilever United States Inc., Dkt. No. 76-2, *available at* http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm224509.htm; *but see Samet v. Procter & Gamble Co.*, 5:12-CV-01891 PSG, 2013 WL 3124647, at *9 (N.D. Cal. June 18, 2013) (questioning whether a website is "labeling");  *Wilson v. Frito-Lay N. Am., Inc.*, 12-1586 SC, 2013 WL 1320468, at *6-7 (N.D. Cal. Apr. 1, 2013) (finding a website is not labeling).

The court grants judicial notice of the FDA's letters because neither party disputes them and their accuracy can be readily determined from the FDA's website.  *See* Fed. R. Evid. 201; s*ee also Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (courts "may take judicial notice of court filings and other matters of public record").

ORDER RE SUMMARY JUDGMENT
Case No. C-12-02646-RMW                                    - 10 -
SW

"contains," and "provides" as nutrient content claims.  21 C.F.R. § 101.54(b), (c).  In a March 24, 2011 FDA warning letter issued to Jonathan's Sprouts, Inc., the FDA advised that certain claims using the word "source" were nutrient content claims.[6]  Request for Judicial Notice, Ex. 1, DC. No. 76-1.  The FDA said that by using the term "source" the company "characterize[d] the level of nutrients of a type required to be in nutrition labeling" and were therefore subject to FDA regulations.  *Id.*  The warning further stated that the FDA had not defined the characterization "source" by regulation and thus a company could not use "source" in a nutrient content claim.  *Id.*

This court already considered the related issue of whether state law claims based on "Natural Source of Antioxidants" seek to enforce a law identical to FDA regulations on nutrient content claims for the purposes of preemption.  Order re 1st MTD 4-9; *see also Gustafson v. Wrigley Sales Co.,* No. 12-CV-01861-LHK, 2013 WL 5201190, at *2, 11-12 (N.D. Cal. Sept. 16, 2013) (reaching the same conclusion).  This court determined that Lanovaz was seeking to enforce a nutrient content claim and thus her claims were not preempted.  *Id.; but see Trazo v. Nestle USA, Inc.*, No. 5:12-CV-2272 PSG, 2013 WL 4083218, at *9 (N.D. Cal. Aug. 9, 2013).  Although "natural source of antioxidants" does not include a qualifying term describing the level or quantity of antioxidants, it does imply a sufficient amount to be significant.  Therefore, the court does not find as a matter of law that the statement is not a nutrient content claim and Twinings' request for summary judgment on the issue is denied.

In her deposition, Lanovaz was asked if the labels on Earl Grey Tea expressed the level of antioxidants.  She replied that it did not "say the amount."  Lanovaz Depo. 14:15-19.  She stated that the phrase "Natural Source of Antioxidants" meant that the product "contains antioxidants that are healthy and good for me."  *Id.* at 12:12-15, 85:23-25.  She interpreted "natural source" to mean that the antioxidants are part of the product and not added.  *Id.* at 18:7-15.  Twinings argues that this shows Lanovaz did not think "natural source" was a representation by Twinings as to the amount of antioxidants present in the tea.  Although these statements suggest that Lanovaz did not consider the label to characterize a particular level of antioxidants, she also stated that she understood the label to mean that the tea was a "major source" of antioxidants.  *See* Lanovaz Depo. 86:1-11 (both labels say

---

[6] Jonathan Sprouts' label had the claim "Phytoestrogen Source" and its website had the claim "Alfalfa sprouts are one of our finest food sources of . . . saponin."

"that it's a major source – a natural source of antioxidants"), 54:3-12 ("they led me to believe that it was a major source of antioxidants," although here it is a little unclear if "they" refers to the labels). Lanovaz also believed that enough antioxidants were present in Twinings' tea to have health benefits. *Id.* at 84:17-85:6.  Misconceptions about health benefits are what the FDA regulations are trying to prevent; and the UCL and FAL protect against true statements that are misleading. *See Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002).

In her complaint, Lanovaz also argues that Twinings' labels and website make illegal health claims.  Twinings moves for summary adjudication on these claims as well.  In her opposition, Lanovaz focuses on the label on Twinings' Green Tea, which states "[a] natural source of protective antioxidants . . . Twinings' Green Teas provide a great tasting and healthy tea drinking experience," Stern Decl. Ex. B, Dkt. No. 70-2, and statements on Twinings' website.  She does not seem to argue that the label "natural source of antioxidants" makes a health claim.

In her deposition, Lanovaz stated that Twinings' Green Tea labels did not say anything about diseases or health conditions.  Lanovaz Depo. 18:2-4.  She does not believe the teas are unhealthy or that they are a drug. *Id.* at 26:4-13.  Nevertheless, Lanovaz also stated that she purchased Twinings' Green Tea because she believed it was healthy for her. *Id.* at 54:10-12, 84:17-85:6.

Under FDA regulations, a health claim is a statement that "expressly or by implication . . . characterizes the relationship of any substance to a disease or health-related condition."  21 C.F.R. § 101.14(a)(1).  A health-related condition "means damage to an organ, part, structure, or system of the body such that it does not function properly (e.g., cardiovascular disease), or a state of health leading to such dysfunctioning (e.g., hypertension); except that diseases resulting from essential nutrient deficiencies (e.g., scurvy, pellagra) are not included in this definition."  21 C.F.R. § 101.14(a)(5).  General claims that a food is healthy are not health-related claims, but rather are nutrient content claims. *See* 21 C.F.R. § 101.13(b)(2)(ii).

Although Lanovaz argues that the term "protective," as used in the label, implies protection from disease by citing to an FDA regulation defining the term "drug," her argument is not supported by the plain language of the label or the regulation she cites. *See* 21 U.S.C. § 321(g)(1)(D).  The

1    regulation merely states that when a party claims that a substance protects against a disease, FDA

2    regulations apply.  *Id.*  Because the label does not say anything about a disease, the court finds that

3    the label does not make disease-related health claim.

4           Additionally, a label claiming "protective antioxidants" and a "healthy tea drinking

5    experience" are too general to relate to a "health-related condition."  The type of "health-related

6    conditions" the regulation covers are specific ones like hypertension.  *See* 21 C.F.R. § 101.14(a)(5).

7    Here, Twinings' labels only makes, at most, a generalized health claim, which is how Lanovaz

8    understood them.  *But see Trazo*, 2013 WL 4083218, at *10 (suggesting generalized health claims

9    are FDA regulated health claims).  Such a general claim is not a violation of FDA regulations.

10   **D.  Standing**

11           **1. Economic Injury**

12          Twinings also argues that Lanovaz cannot establish an injury sufficient for Article III or

13   UCL standing.  To satisfy Article III, a plaintiff "must show that (1) it has suffered an 'injury in

14   fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or

15   hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is

16   likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

17   *Friends of the Earth, Inc. v. Laidlaw Envtl. Sys. (TOC), Inc.,* 528 U.S. 167, 180-181 (2000).  As the

18   Supreme Court noted, "palpable economic injuries have long been recognized as sufficient to lay

19   the basis for standing."  *Sierra Club v. Morton*, 405 U.S. 727, 733 (1972).  To have standing under

20   the UCL and FAL a plaintiff must have suffered economic injuries, but the "the quantum of lost

21   money or property necessary to show [UCL and FAL] standing is only so much as would suffice to

22   establish [Article III] injury in fact."  *Kwikset*, 51 Cal. 4th at 324.

23          Twinings argues that Lanovaz lacks standing to bring her UCL, FAL, and CLRA claims

24   because (1) there is no evidence she paid a premium, which she needs to establish injury; (2) she has

25   stated she will not buy Twinings' tea again and thus there is no future risk of harm; and (3) she was

26   not injured by products she did not buy.  The court addresses each of these arguments in turn.

27          An "identifiable trifle" of injury is sufficient for standing and a plaintiff can meet this

28   standard if he is charged more than he otherwise would have been because of unfair business

ORDER RE SUMMARY JUDGMENT
Case No. C-12-02646-RMW                           - 13 -
SW

practices. *Kwikset*, 51 Cal. 4th at 324-25. Although *Kwikset* was decided on a motion to dismiss, its holding that because standing is a threshold issue, "the specific measure of the amount of [ ] loss is not required," still applies. *Id.* at 330 n.15; *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 789 (2010) ("That a party may ultimately be unable to prove a right to damages . . . does not demonstrate that it lacks standing to argue for its entitlement to them").

Twinings relies on two decisions granting summary judgment because the plaintiffs failed to demonstrate damages adequately. In *Ries v. Arizona Beverages*, the court granted summary judgment at the end of discovery when plaintiffs could not produce any evidence to support damages. *See Ries v. Arizona Beverages USA LLC,* 10-01139 RS, 2013 WL 1287416, at *7-8 (N.D. Cal. Mar. 28, 2013). In *Weiner v. Snapple Beverage Corporation*, the court granted summary judgment because the plaintiffs failed to demonstrate "damages *with a degree of certainty*" as required by New York's version of the UCL. No. C 07–08742, 2011 WL 196930, *5 (S.D.N.Y. Jan. 21, 2011). Both decisions are distinguishable, however, because they related to damages as an element of the claim, not standing. *See Ries v. Arizona Beverages USA LLC,* 287 F.R.D. 523, 530 (N.D. Cal. 2012) (criticizing *Weiner*).

Although Lanovaz may have significant difficulty proving damages, that is not an issue for standing. *See* Lanovaz Depo. at 46:8-16, 84:2-4. Paying more than she otherwise would have because of unfair competition is enough to establish standing. *See Clayworth*, 49 Cal. 4th at 788 (holding that paying overcharges due to a price-fixing conspiracy was sufficient injury for standing). Although Lanovaz stated that she was unlikely to purchase other brands of tea, she could still have been injured if she paid a premium to Twinings because of unlawful or unfair business practices not based on misrepresentations. *Id.*

Summary judgment is inappropriate at this point on the basis that evidence of an unfair premium did not come out of the deposition of the named plaintiff. Lanovaz seeks to discover Twinings' financial records and pricing information, which she claims could show incremental price increases related to its unfair practices. Because such evidence could establish injury and Lanovaz has not had an opportunity to obtain it, the court denies summary judgment on this issue at this time.

### 2. Standing for Injunctive Relief

A plaintiff "must demonstrate standing separately for each form of relief sought."  *Friends of the Earth*, 528 U.S. at 185.  To establish Article III standing for injunctive relief, in addition to the elements described above, plaintiffs must show "a very significant possibility of future harm; it is insufficient for them to demonstrate only a past injury."  *San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996).  Standing to bring a damages claim does not necessarily imply standing to seek injunctive relief.  *See City of Los Angeles v. Lyons,* 461 U.S. 95, 105 (1983) (holding that being illegally choked by the police presumably afforded standing for damages but did not establish a real and immediate threat of future harm necessary for standing to seek injunctive relief).  Furthermore, "[u]nless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief."  *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999).

Twinings argues that Lanovaz cannot establish a significant possibility of future harm because she stopped buying Twinings' tea.  Lanovaz Depo. 36:9-10.  Twinings relies on *McNair v. Synapse Grp. Inc.* in which the Third Circuit found that former customers alleging consumer fraud did not have standing to seek injunctive relief against a magazine subscriptions marketer because they were no longer customers and unlikely to become customers again.  672 F.3d 213, 224-26 (3d Cir. 2012).  The court also found that the "capable of repetition yet evading review" doctrine did not apply because the fraud was unlikely to happen again to the plaintiffs.  *Id.* at 226.  The *McNair* decision was binding on *Robinson v. Hornell Brewing Co.*, which found no standing to seek injunctive relief for labels on beverages saying "All Natural" where the plaintiff stated he did not ever intend to purchase the product again.  No. CIV. 11-2183 JBS-JS, 2012 WL 1232188, at *4 (D.N.J. Apr. 11, 2012).

Many district courts in California, however, disagree with the reasoning of *McNair* and *Robinson*, recognizing that if a court were to construe standing as narrowly as Twinings advocates

> federal courts would be precluded from enjoining false advertising under
> California consumer laws because a plaintiff who had been injured would
> always be deemed to avoid the cause of the injury thereafter ... and would
> never have Article III standing ... Prevent[ing] them from bringing suit
> would surely thwart the objective of California's consumer protection
> laws.  That objective is "to protect both consumers and competitors by

1

2

promoting fair competition in commercial markets for goods and
services." *Kwikset Corporation v. Superior Court of Orange County*, 51
Cal. 4th 310, 320 (2011).

3    *Larsen v. Trader Joe's Co.*, No. C 11-05188 SI, 2012 WL 5458396, at *4 (N.D. Cal. June 14, 2012)

4    (quoting *Henderson v. Gruma Corp.*, No. CV 10-04173 AHM AJWX, 2011 WL 1362188, at *7

5    (C.D. Cal. Apr. 11, 2011)).  The court in *Koehler v. Litehouse, Inc.* also agreed with *Henderson v.*

6    *Gruma Corp.*, because denying standing in false advertising cases would "eviscerate the intent of

7    the California legislature in creating consumer protection statutes because it would effectively bar

8    any consumer who avoids the offending product from seeking injunctive relief."  No. CV 12-04055

9    SI, 2012 WL 6217635, at *6 (N.D. Cal. Dec. 13, 2012).  The court in *Ries v. Arizona Beverages*

10   took a slightly different approach and found that plaintiffs continue to be injured by misleading

11   labels because they cannot rely on the accuracy of labels whenever they go to the store.  *See* 287

12   F.R.D. 523, 533 (N.D. Cal. 2012).

13            Twinings cites a couple of California cases that rule otherwise, but they are not advertising

14   cases.  *See In re Intel Laptop Battery Litig.*, C 09-02889 JW, 2011 WL 7290487 (N.D. Cal. Apr. 7,

15   2011) (unfair business practice of writing self-serving benchmarks); *Stearns v. Select Comfort*

16   *Retail Corp.*, 763 F. Supp. 2d 1128 (N.D. Cal. 2010) (defectively designed beds that easily molded).

17   The court finds the reasoning of *Henderson v. Gruma* and the cases following it more convincing

18   and accordingly finds that Lanovaz has standing to seek injunctive relief.

19                          **3.  Standing to Sue for Products She Did Not Buy**

20            Twinings moves for summary ajudication contending that Lanovaz does not have standing

21   for her claims related to the 45 varieties of black, white, and green tea she did not purchase.

22   Twinings raised this issue in its second motion to dismiss.  In response, the court held that a class

23   representative has standing to bring substantially identical claims on behalf of a class and that

24   Lanovaz's claims related to the 45 varieties of tea she did not purchase were allegedly substantially

25   identical.  *See* Order re 2nd MTD, Dkt. No. 60.  Defendant has not presented any evidence to

26   support changing this position and these issues are better resolved under Rule 23.

27

28

ORDER RE SUMMARY JUDGMENT
Case No. C-12-02646-RMW
SW

- 16 -

### III.  ORDER

For the reasons stated above, the court grants summary adjudication that Twinings has not made a health claim as described in 21 C.F.R. §101.14(a)(1).  The motion is otherwise denied.

Dated: January 6, 2013

*Ronald M. Whyte*

RONALD M. WHYTE
United States District Judge